**The UNITED STATES, Appellant,**

v.

**YOSHIDA INTERNATIONAL, INC., Appellee.**

**Customs Appeal No. 75–6.**

United States Court of Customs and Patent Appeals.

Nov. 6, 1975.

564

Andrew P. Vance, Chief, Customs Section, Civil Division, Department of Justice, New York City, for the United States.

E. Thomas Honey, Barnes, Richardson & Colburn, New York City, for Yoshida International, Inc.

MARKEY, Chief Judge.

This is an appeal from a judgment of the Customs Court, 73 Cust.Ct. 1, C.D. 4550, 378 F.Supp. 1155 (1974), granting Yoshida's motion for summary judgment, and declaring an import duty surcharge invalid. Presidential Proclamation 4074, because it imposed the surcharge, was held to have been beyond the President's delegated powers. The court stated that a delegation of sufficient breadth to encompass the proclamation would have been unconstitutional. We reverse.

*Facts*

Yoshida's merchandise (zippers) was imported from Japan and entered the port of New York on August 17, 25, and 26, 1971. The government levied, in addition to the standard duty under TSUS item 745.72, an import duty surcharge of 10% in accordance with item 948.00, which was added to the TSUS by Presidential Proclamation 4074.[1] Yoshida challenges only the validity of Proclamation 4074.

*Amicus*

American Importers Association, Inc., filed a brief *amicus curiae* seeking, in the event of an affirmance, a declaration that the liquidations herein were null and void and the protests premature, the

1. 85 Stat. 926, dated August 15, 1971, effective August 16, 1971.

effect of which would be to remove barriers to a refund of amounts exacted by the surcharge. The government filed an opposing brief. The judgment below being reversed, the requests of *amicus* must be dismissed as moot.

### President's Actions

During the summer of 1971, the United States was faced with an economic crisis. The nation suffered under an exceptionally severe and worsening balance of payments deficit. The gold reserve backing of the U. S. dollar had dropped from $17.8 billion in 1960 to less than $10.4 billion in June of 1971,[2] reflecting a growing lack of confidence in the U. S. dollar abroad. Foreign exchange rates were being controlled by some of our major trading partners in such a way as to overvalue the U. S. dollar. That action, by stimulating U. S. imports and restraining U. S. exports, contributed substantially to the balance of payments deficit.[3] As one step in a program designed to meet the economic crisis,[4] the President issued Proclamation 4074, which in relevant part stated:

WHEREAS, there has been a prolonged decline in the international monetary reserves of the United States, and our trade and international competitive position is seriously threatened and, as a result, our continued ability to assure our security could be impaired;

WHEREAS, the balance of payments position of the United States requires the imposition of a surcharge on dutiable imports;

\* \* \* \* \* \*

A. I hereby declare a national emergency during which I call upon the public and private sector to make the efforts necessary to strengthen the international economic position of the United States.

B. (1) I hereby terminate in part for such period as may be necessary and modify prior Presidential Proclamations which carry out trade agreements insofar as such proclamations are inconsistent with, or proclaim duties different from, those made effective pursuant to the terms of this Proclamation.

(2) Such proclamations are suspended only insofar as is required to assess a surcharge in the form of a supplemental duty amounting to 10 percent ad valorem. Such supplemental duty shall be imposed on all dutiable articles \* \* \* provided, however, that

---

**2.** Treasury Bulletin, U. S. Treas. Dept., July 1971.

**3.** Though deficits had occurred in some prior years, the deficit (official reserve transactions balance) amounted to $22 billion (annual rate) during the first quarter of 1971. U. S. Dept. of Commerce, Office of Business Economics, news release OBE 71–43, July 6, 1971.

The U. S. balance of exports and imports had changed from a favorable average annual balance of $5.4 billion during the first half of the 1960's (the high point was $7.1 billion in 1964) to a negative balance of $3.2 billion (annual rate) for the second quarter of 1971. Overseas Business Reports OBR 71–009, U. S. Dept. of Commerce, Feb. 1971; U. S. Dept. of Commerce, Bureau of the Census, news release FT 900–71–6, July 28, 1971; see also Economic Report of the President 149 and 296 (1972). Vis-à-vis the United States, Japan's trade balance changed from minus $250 million in 1964 to plus $1.2 billion in 1970, and the Federal Republic of Germany's trade balance changed from minus $449 million in 1964 to plus $390 million in 1970. Overseas Business Reports OBR 71–022, U. S. Dept. of Commerce, July 1971.

**4.** The Proclamation in suit was part of a "New Economic Policy," which involved suspension of the convertibility of foreign held dollars into gold, reductions in taxes, Federal spending and foreign aid, a 90-day wage-price freeze, and imposition of the surcharge "[a]s a temporary measure". "Address to the Nation Outlining a New Economic Policy: 'The Challenge of Peace'," *Public Papers of the Presidents of the United States Richard Nixon 1971* 886 (1972), 65 *Dept. of State Bull.* 253 (1971), New York Times, Aug. 16, 1971, at 14, col. 1. The 90-day freeze, though challenged as based upon an unconstitutional delegation of legislative power, in violation of the separation of powers doctrine, was upheld in *Amalgamated Meat Cutters & Butcher Work. v. Connally*, 337 F.Supp. 737 (D.D.C.1971).

if the imposition of an additional duty of 10 percent ad valorem would cause the total duty or charge payable to exceed the total duty or charge payable at the rate prescribed in column 2 of the Tariff Schedules of the United States, then the column 2 rate shall apply.

To implement the above language, Proclamation 4074 established the following item 948.00 of subpart C, part 2, of the TSUS Appendix:

| Item | Article | Rates of duty | |
|------|---------|---------------|---|
| | | 1 | 2 |
| 948.00 | Articles, except as exempted under headnote 5 of this subpart, which are not free of duty under these schedules and which are the subject of tariff concessions granted by the United States in trade agreements ............ | 10% ad val... (See headnote 3 of this subpart.) | No change. |

The referenced headnote 3 reads as follows:

3. *Limitation on additional duties* —The additional 10 percent rate of duty specified in rate of duty column numbered 1 of item 948.00 shall in no event exceed that rate which, when added to the column numbered 1 rate imposed on the imported article under the appropriate item in schedules 1 through 7 of these schedules, would result in an aggregated rate in excess of the rate provided for such article in rate of duty column numbered 2.

The President's authority for proclaiming the surcharge was stated in Proclamation 4074 to be:

WHEREAS, pursuant to the authority vested in him by the Constitution and the statutes, including, but not limited to, the Tariff Act of 1930, as amended (hereinafter referred to as "the Tariff Act"), and the Trade Expansion Act of 1962 (hereinafter referred to as "the TEA"), the President entered into, and proclaimed tariff rates under, trade agreements with foreign countries;

WHEREAS, under the Tariff Act, the TEA and other provisions of law, the President may, at any time, modify or terminate, in whole or in part, any proclamation made under his authority; * * *.

Importers of products subject to the surcharge sought and obtained permission from the Cost of Living Council to pass the surcharge through to customers as a part of the price of the imported articles.[5]

Within less than five months following imposition of the surcharge, a multilateral agreement (The "Smithsonian Agreement" of December 18, 1971) among the major industrial nations was reached[6] which, inter alia, gave promise of ending

---

5. Cost of Living Council Order No. 2, 36 Fed. Reg. 16215 (1971).

6. "Group of Ten Ministerial Meeting Agrees on Realignment of Currency and Future Monetary Reforms," 66 *Dept. of State Bull.* 32 (Jan. 10, 1972); Economic Report of the President 142 (1972).

the overvaluation of the U. S. dollar in relation to other major currencies. On December 20, 1971, the import duty surcharge was terminated. (Presidential Proclamation 4098, 36 Fed.Reg. 24201 (1971).)

*Customs Court*

The main opinion below [7] dealt extensively with the President's termination and emergency powers, finding that neither encompassed the tariff surcharge promulgated in Proclamation 4074.

The President's termination power, as expressed in the Tariff Act of 1930, as amended (Tariff Act) and the Trade Expansion Act of 1962 (TEA), was construed as follows:

> We conclude that the authority granted by statute to "terminate, in whole or in part, any proclamation" does not include the power to determine and fix unilaterally a rate of duty which has not been previously legally established. On the contrary, the "termination" authority, as statutorily granted, merely provides the President with a mechanical procedure of supplanting or replacing existing rates with rates which have been established by prior proclamations or by statute. Relevant thereto is *United States v. American Bitumuls & Asphalt Co.*, 44 CCPA 199, C.A.D. 661, 246 F.2d 270 (1957), *cert. denied*, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113 (1957).

The power to "terminate, in whole or in part," existing proclaimed rates was characterized as twofold: the President may "nullify and bring to an end an entire proclamation" (whereupon the duty rate would revert to one previously established but not terminated), or he may "specify the extent to which a prior proclamation is terminated, thereby permitting a portion thereof to remain in effect." Thus, said the court, exercise of the termination power affects duty rates

> * * * (1) to increase rates to the highest level, *i. e.,* the statutory rate, or (2) to raise or lower rates to conform to rates which have been established by a prior proclamation. In either of these instances, the rates, to which conformance may be sought, have been previously established either by the Congress (statutory rate) or by a bilateral negotiation embodied in a trade agreement pursuant to statutory authority. In short, the power to fix a new and independent rate requires a greater grant of power than that delegated to the President by the termination authority.

The Government's reliance on the phrase "unless otherwise provided" in general headnote 4(d) of the tariff schedules [8] was met with these words:

> In our view that phrase is nothing more than an exception to the provision contained in headnote 4(d) fixing the order of rate reversion resulting from a termination proclamation. More specifically, the phrase "unless otherwise provided" gives the President discretionary authority when terminating a proclamation to specify a rate established in a specific previous proclamation other than the next intervening proclamation and thus avoid an automatic reversion to the next intervening proclaimed rate. In other words, the phrase "unless otherwise provided" contemplates only the exercise of Presidential discretion to preclude the order of reversion set forth in general headnote 4(d).

The President's emergency power, as expressed in the Trading With the Ene-

---

7. The case was heard by a three-judge panel, pursuant to § 108 of the Customs Courts Act of 1970 (28 U.S.C. § 255) and rule 4.13 of the Customs Court. A concurring opinion and a concurring statement were filed with the main opinion.

8. General headnote 4(d) provides:

 whenever a proclaimed rate is terminated or suspended, the rate shall revert, unless otherwise provided, to the next intervening proclaimed rate previously superseded but not terminated or, if none, to the statutory rate.

my Act (TWEA), section 5(b), to "regulate * * * importation * * * of * * * any property in which any foreign country or a national thereof has any interest," said the Customs Court,

> * * * conveys to the President an authority consisting only of a specific mode of regulation, as distinguished from the full and all-inclusive power to regulate foreign commerce. The delegation of the specific regulatory authority, "by means of instructions, licenses, or otherwise," manifestly is restrictive in scope and is but one branch of many attached to the trunk of the tree in which is lodged the all-inclusive substantive power to regulate foreign commerce, vested solely in the Congress.

We, therefore, conclude that section 5(b)(1) of the Act contains such restrictive standards and guidelines as to meet the test of constitutionality, but which, in turn, precludes the President from laying the supplemental duties provided by Presidential Proclamation 4074.

Though recognizing that the power to impose duties "may also serve as a regulatory measure," the Customs Court felt that the power to "regulate" could not, per se, be said to include the power to levy duties, citing *Hamilton v. Dillin,* 88 U.S. (21 Wall.) 73, 22 L.Ed. 528 (1875).

The "emergency" feature of the TWEA was noted by the Customs Court in these words:

> For legislation delegating restrictive regulatory authority cannot operate, merely upon the declaration of an emergency, to the exclusion of other legislative acts providing procedures prescribed by the Congress for the accomplishment of the very purpose sought to be attained by Presidential Proclamation 4074. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). * * * If the words "regulate * * * importation" were given the construction contended by the defendant, the President by the declaration

of a national emergency could determine and fix rates of duty at will, without regard to statutory rates prescribed by the Congress and without the benefit of standards or guidelines which must accompany any valid delegation of a constitutional power by the Congress. *Hampton & Co. v. United States,* supra, 276 U.S. 394 p. 409, 48 S.Ct. 348, 72 L.Ed. 624. The delegation of such an unrestrained and unbridled authority to lay duties, indeed, might well be deemed an abdication by the Congress of its constitutional power to regulate foreign commerce.

Citing *Panama Refining Co. v. Ryan,* 293 U.S. 388, 420, 55 S.Ct. 241, 79 L.Ed. 446 (1935), for the proposition that good motives are not in point, the Customs Court summarized its view that neither motive nor national emergency would sustain the President's authority to issue Proclamation 4074 as follows:

> This court is not without appreciation of the burdensome problems encountered by the Executive as he represents these United States in the society of nations. Nor can the court fail to recognize the efforts of the President to achieve stability in the international trade position and monetary reserves of this country. But neither need nor national emergency will justify the exercise of a power by the Executive not inherent in his office nor delegated by the Congress. Expedience cannot justify the means by which a deserving and beneficial national result is accomplished. To indulge in judicial rationalization in order to sanction the exercise of a power where no power in fact exists is to strike the deadliest of blows to our Constitution.

The concurring opinion set forth substantial additional portions of the TWEA's legislative history, with this summarization:

> Thus it can be seen that the amendments to section 5(b) successively extended the President's licensing authority in the areas of foreign ex-

change, banking and currency transactions and transactions involving property in which foreign countries or nationals have an interest. However, nowhere in the Congressional debates, committee hearings or reports on section 5(b) and the amendments thereto is there even a glimmer of a suggestion that Congress ever intended—or even considered—this section as a vehicle for delegating any of its tariff-making authority. [Footnote omitted.]

### *Issue*

The sole issue before us is whether the Customs Court erred, as a matter of law, in holding that Proclamation 4074 was an ultra vires Presidential act. Resolution of the issue requires determination of whether the surcharge imposed by Presidential Proclamation 4074 was within the delegated authority to be found in either (1) the termination provisions of § 350(a)(6) of the Tariff Act of 1930, as amended (Tariff Act) (19 U.S.C. § 1351(a)(6)) and § 255(b) of the Trade Expansion Act of 1962 (TEA) (19 U.S.C. § 1885(b)),[9] or (2) the emergency powers granted by § 5(b) of the Trading With the Enemy Act (TWEA), as amended (50 U.S.C. App. § 5(b)),[10] and if so, whether such a delegation of authority was constitutional.

### OPINION

The people of the new United States, in adopting the Constitution, granted the power to "lay and collect duties" and to "regulate commerce" to the Congress, not to the Executive. U.S. Constitution, Art. I, Sec. 8, clauses 1 and 3. Nonetheless, as the Customs Court recognized in the opinion below, and as other courts and commentators have noted,[11] Congress, beginning as early as 1794 and continuing into 1974,[12] has delegated the exercise of much of the power to regulate foreign commerce to the Executive. As perhaps an inevitable result, "few areas of American constitutional law [are] more burdened with conflicting decisions and scholarly disagreement." Recent Decisions, 15 *Va.J.Int'l L.* 649 (1975).

As inferred in *United States v. Curtiss-Wright Export Corp.*, 299 U.S.

---

**9.** The Tariff Act and the TEA permit the President to enter foreign trade agreements and to implement them through modification of duties by proclamation. Each contains a termination provision:

"The President may at any time terminate, in whole or in part, any proclamation made pursuant to this section." (§ 350(a)(6), Tariff Act of 1930, as amended);

"The President may at any time terminate, in whole or in part, any proclamation made under this subchapter." (§ 255(b), Trade Expansion Act of 1962).

**10.** TWEA § 5(b), in pertinent part, follows:

(b)(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by through, or to any banking institution, and the importing, exporting, hording, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States; * * *.

**11.** See Recent Decisions, 15 *Va.J.Int'l L.* 649 (1975); Comment, "The Import Surcharge of 1971: A Case Study of Executive Power in Foreign Commerce," 7 *Vand.J.Transnat'l L.* 137, 155 (1973); Garson & Miller, "The Foreign Direct Investment Regulations: Constitutional Questions and Operational Aspects Examined," 11 *B.C.Ind. & Com.L.Rev.* 143, 168 (1970); Bassiouni & Landau, "Presidential Discretion In Foreign Trade and Its Effect on East-West Trade," 14 *Wayne L.Rev.* 494 (1968).

**12.** Act of June 4, 1794, ch. 41, § 1, 1 Stat. 372; Trade Act of 1974, Pub.L. No. 93–618, § 1 et seq. (Jan. 3, 1975), 88 Stat. 1978 (19 U.S.C. § 2101 et seq.).

304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the President has certain "inherent" powers in the conduct of foreign relations and foreign affairs. Some of the commentators referred to above have cited certain "concurrent" powers he shares with the Congress in those fields. The Supreme Court referred to "pooled" legislative and executive powers in foreign affairs, including delegations of power over foreign commerce, in *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 110, 68 S.Ct. 431, 92 L.Ed. 568 (1948). It is nonetheless clear that no undelegated power to regulate *commerce,* or to set tariffs, inheres in the Presidency.[13]

### Termination Provisions

■ We are in basic agreement with the Customs Court's interpretation (quoted above) of the termination powers delegated by the Congress in the Tariff Act and in the TEA. *United States v. American Bitumuls & Asphalt Co.,* 246 F.2d 270, 44 CCPA 199, C.A.D. 661 (1957), *cert. denied,* 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113.

Having correctly found no delegation, in the acts or in their legislative histo-

ries, of the power to impose the surcharge here in question, the Customs Court nonetheless applied, and the parties have argued, the "separation of powers doctrine" and its corollary, the "delegation doctrine," in relation to the termination provisions of the Tariff Act and the TEA. But whether the limitations on Congress' power to delegate, as gleaned by the Customs Court from *Schechter Poultry v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), are still viable, or whether they now rest on a rusted concept,[14] are questions raisable only after it is determined that a particular delegation had been attempted. It is unnecessary to discuss the constitutional ramifications that might obtain if Congress *had* made such a delegation in the Tariff Act or in the TEA.[15]

### Emergency Powers

We are presented, in this case, with the first reliance upon the TWEA as authority for a Presidential imposition of a temporary surcharge on imports. There being nothing in the TWEA or in its

---

13. If the reference in Proclamation 4074 to "the authority vested in him by the Constitution" was intended to indicate the view that the Constitution vests in the President any power to set tariffs or to lay duties or to regulate foreign commerce, that view was clearly in error. U.S. Constitution, Art. I, Sec. 8, clauses 1 and 3.

14. At least one commentator views *Schechter* and *Panama* as archaic, asserting that the "vaguest of standards are held adequate, and various delegations without standards have been upheld." (Footnote omitted.) 1 K. Davis, *Administrative Law Treatise* 76 (1958).

The Customs Court did not refer to the state of suspended animation in which these two cases have so long lain, or to any distinction between the domestic character of the actions therein and the foreign trade environment of the present case, or to the many cases, since 1935, in which the Supreme Court has not followed the rigid view of Congress' power to delegate expressed in those two cases.

*Schechter* was relied upon by the Supreme Court, for the first time since 1936, in *National*

*Cable Television Assn., Inc. v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), which did not involve foreign trade. That resurrection of the delegation doctrine was strongly criticized in the dissenting opinion of Mr. Justice Marshall. 415 U.S. at 352, 94 S.Ct. 1146.

15. Of general interest is § 122(h) of the Trade Act of 1974, supra note 12, which *prohibits* use of the termination power as authority for imposition of a surcharge. Though the Tariff Act and the TEA were cited, it is doubtful that Proclamation 4074 was an actual exercise of the termination power. The proclamation refers to "terminate in part" and includes "modify" and "suspended." The reference to "terminate" was only "for such period as may be necessary." The rates of duty were returned by Proclamation 4098 to those in effect prior to Proclamation 4074. The President's Address, supra note 4, described the surcharge, as "a temporary measure" and as a "temporary action" that would end when "the unfair treatment is ended."

history which specifically either authorizes or prohibits the imposition of a surcharge, and no judicial precedent involving the same, we tread new ground.[16]

### Power Delegated

■ Our duty is to effectuate the intent of Congress. In so doing, we look first to the literal meaning of the words employed. *Flora v. United States,* 357 U.S. 63, 65, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958). Analysis of the statute and its wording provides the threshold determination of what *was* delegated by the Congress.

■ The express delegation in § 5(b) of the TWEA is broad indeed. It provides that the President may, during "any" period of national emergency declared by him, through "any" agency he designates, or "otherwise," and under "any" rules he prescribes, by means of instructions, licenses, "or otherwise," "regulate," "prevent" or "prohibit" the importation of "any" property [17] in which "any" foreign country or a national thereof has "any" interest, and that the President may, in the manner provided, take "other and further measures," not inconsistent with the statute, for the "enforcement" of the Act.

The Act authorizes the President to define "any or all" of the terms employed by Congress in § 5(b). 50 U.S.C. App. 5(b)(3).

■ It appears incontestable that § 5(b) does in fact delegate to the President, for use during war or during national emergency only, the power to "regulate importation." The plain and unambiguous wording of the statute permits no other interpretation. As was said of a war power in *Lichter v. United States,* 334 U.S. 742, 782, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948), the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully. The delegation in § 5(b) is broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress.[18]

---

**16.** The TWEA has been considered by many different courts in hundreds of cases involving a variety of executive actions. Because it was hastily amended, the TWEA "has presented to the judiciary a collection of knotty problems which are probably not surpassed by those arising under any other statute of its size or weight." Bishop, "Judicial Construction of the Trading With the Enemy Act," 62 *Harv.L.Rev.* 721 (1949). It has nonetheless survived every attack on its constitutionality: See, e. g., *Veterans & Reserv. For Peace in Vietnam v. Regional Com'r,* 459 F.2d 676 (3d Cir.), *cert. denied,* 409 U.S. 933, 93 S.Ct. 232, 34 L.Ed.2d 188 (1972) (literature detained under the Foreign Assets Control Regulations); *Nielson v. Secretary of Treasury,* 424 F.2d 833, 137 U.S. App.D.C. 345 (1970) (bank account blocked under the Cuban Assets Control Regulations); *Teague v. Regional Commissioner of Customs, Region II,* 404 F.2d 441 (2d Cir. 1968), *cert. denied,* 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969) (publications detained under the Foreign Assets Control Regulations); *Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir.), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966) (bank account blocked under the Cuban Assets Control Regulations); *Silesian-American Corp. v. Markham,* 156 F.2d 793 (2d Cir. 1946), *aff'd sub nom. Silesian-American Corp. v. Clark,* 332 U.S. 469, 68 S.Ct. 179, 92 L.Ed. 81 (1947) (corporation stock vested in Alien Property Custodian); *Draeger Shipping Co. v. Crowley,* 55 F.Supp. 906 (S.D.N.Y.1944) (corporation stock vested in Alien Property Custodian).

**17.** Appellee's argument that the TWEA is limited to importations of property having an "enemy taint" is foreclosed by the statutory reference to "any" property of "any" foreign country or national thereof. Appellee misconstrues *Clark v. Uebersee Finanz-Korp.,* 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947), which dealt with the right of a friendly alien to recover property seized under the vesting power. The court did not hold that the vesting power, let alone the regulatory power, was limited to property having an enemy "taint." See *United States v. Broverman,* 180 F.Supp. 631, 634–35 (S.D.N.Y.1959).

**18.** Thus the more obvious constitutional questions that would arise if the President had acted in the absence of *any* delegated authority are not present. As discussed below, questions raisable if the President had ventured to

A question remains, however, as to *how* the President may regulate importation in a national emergency, i. e., what means of execution of the delegated power are permissible. As appears below, we agree with the Customs Court that the delegation could not constitutionally have been of "the full and all-inclusive power to regulate foreign commerce." We do not believe, however, as the Customs Court apparently did, that only in such a sweeping delegation could authority be found for Proclamation 4074. The choice is not draconian.

### Means of Execution

The Customs Court, considering a broad delegation unconstitutional in the absence of standards restricting the President's actions thereunder, found such standards in an interpretation of the words "by means of instructions, licenses or otherwise" as words of restriction. Citing the war-related history of the Act, commencing with the Act of July 13, 1861 (12 Stat. 255, 257), and its genesis in the common law rule against trading with an enemy, the Customs Court carried through to the present day the licensing or permission to import specific goods originally envisaged as the means of executing the power delegated by the Act.

We agree with the Customs Court on the necessity of determining the scope and extent of delegated regulatory power.[19] The question in this context is whether Congress, having itself regulated imports by employing duties as

a regulatory tool, and having delegated to the President, for use in national emergencies, the power to regulate imports, intended to permit the President to employ the same regulatory tool, and what, if any, limitations lay upon his use thereof.

The opinion below states:

The words "instructions, licenses, or otherwise" contained in section 5(b)(1) define the nature and mode of the regulatory authority intended to be delegated to the President. These words conform to the phraseology used through the history of the Act in the establishment of a system of *licenses and permits* for the control of property during a time of war and crisis and which have come to be recognized as the hallmark and distinguishing feature of the Act. (Emphasis added.)

We do not find, however, that the words "instructions, licenses, or otherwise," either "conform to the phraseology used throughout the history of the Act" or "have come to be recognized as the hallmark and distinguishing feature of the Act." No specific authority was cited in support of that view and we find none. The words "instructions" and "importation" were not added until 1941. As the concurring opinion below recognizes, the legislative history of the TWEA is silent regarding the reasons for the 1941 insertion of those two words. A statute must be interpreted as a whole, and we cannot reconcile the Customs Court's restrictive view with the remainder of § 5(b), which authorizes

---

act in direct *contravention* of a statute prohibiting or otherwise pre-empting his action are also absent.

**19.** The Customs Court cited *Hamilton v. Dillin,* 88 U.S. (21 Wall.) 73, 22 L.Ed. 528 (1874) for this proposition. In *Hamilton,* however, it is noteworthy that President Lincoln's imposition of a fee on imports of cotton from insurrectionary states under § 5 of the Act of July 13, 1861, 12 Stat. 257, a progenitor of the TWEA, was *upheld* by the Supreme Court, against the argument that a regulatory fee was *precluded by other statutes* setting a tax on cotton and against the claim that the fee was not a "regulation," saying (88 U.S. at 93):

It shows, however, that the rule of construction depends, at least in some sort, upon the nature of the subject-matter. In the case before us, the power of the government to open and regulate trade with the enemy was intended to be conferred upon the President and the Secretary of the Treasury. The power of regulation in such a case is to be taken in its broadest sense, and, in our judgment, included the power to impose such conditions as the President and Secretary should see fit.

the President to take numerous actions not amenable to "licensing."

 Recognizing that to impose duties can be to "regulate," [20] the Customs Court nonetheless interpreted the words "the President may * * * regulate * * * importation" as though they read, in effect, "the President may * * * license * * * importation." We cannot agree.

 Also relying on the war-related history of the TWEA and its progenitors, appellee argues, in agreement with the Customs Court's view, that the congressional intent of § 5(b) is to allow the President only to permit trade, not to prohibit it. The argument fails on two bases. The statute itself authorizes the President, during emergencies, to "regulate * * * prevent or *prohibit* * * importation." Secondly, the argument unrealistically by-passes more recent history of the TWEA. The 1933 amendment,[21] delegating power to the President for use in response to economic emergencies (indeed, to "any" national emergency declared by the President, *Pike v. United States,* 340 F.2d 487, 489 (9th Cir. 1965)), clearly expanded the purview of the TWEA from that which encompassed only trading with an enemy in time of war to that which also encompassed dealing with "any" national emergency, including those involving no enemy and no war-related trading.[22]

Adhering to the analogy applied by the Customs Court, which found the roots of the TWEA in the Act of July 13, 1861 and the delegation in § 5(b) a branch of the tree in which congressional power to regulate foreign commerce is lodged, we find, Mendel-like, a cross-breeding which produced an economic emergency branch. Only if the TWEA had remained limited to trading with the enemy in "time of war" would the "licensing" limitation and its historical background be controlling. The First War Powers Act of 1941, 55 Stat. 839, the fourth and last amendment to the TWEA, was indeed "hasty legislation," as described by the Supreme Court in *Clark v. Uebersee Finanz Korporation,* supra, note 17, having been adopted upon the onset of war. The Congress, however, did not withdraw or diminish any previously delegated power. Moreover, apparently perceiving no threat of abuse of executive power, Congress has been content to let the Act stand untouched for thirty-four years, while vari-

---

20. Though the power to tax and to lay duties upon imports and the power to regulate commerce·are distinct, it is well established that the first power can be employed in the exercise of the second. See *McGoldrick v. Gulf Oil Corp.,* 309 U.S. 414, 428, 60 S.Ct. 664, 84 L.Ed. 840 (1940); *Board of Trustees v. United States,* 289 U.S. 48, 58, 53 S.Ct. 509, 77 L.Ed. 1025 (1933); *Hampton & Co. v. United States,* 276 U.S. 394, 411, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 202, 6 L.Ed. 23 (1824).

21. Act of March 9, 1933, ch. 1, § 2, 48 Stat. 1.

22. A statute is not restricted by its title. *Brotherhood of R. R. Trainmen v. Baltimore & O. R. R. Co.,* 331 U.S. 519, 528–9, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). We are told that the TWEA was not cited in Proclamation 4074 by name (though it is incorporated by "but not ·limited to") because it would be inappropriate in a proclamation affecting "friendly" or "neutral" nations. In view of the applicability of the TWEA to "any" period of national emergency, it is not necessary to consider interna-

tional monetary competitors as even economic "enemies." Nor does the fact that Proclamation 4074 had no effect on "hostile" nations not entitled to most-favored-nation treatment influence consideration of an Act directed to "any" property of "any" nation or foreign national. *United States v. Quong,* 303 F.2d 499, 503 (6th Cir. 1962), *cert. denied,* 371 U.S. 863, 83 S.Ct. 119, 9 L.Ed.2d 100. See also *United States v. Broverman,* 180 F.Supp. 631 (S.D.N.Y.1959). Though appellee argues that the surcharge violated our international agreements under the General Agreement on Tariffs and Trade (GATT), and it is true that the GATT forbids the use of surcharges, our Congress has never ratified the GATT; moreover, nine member countries had imposed surcharges (all of which were waived or tolerated by the GATT organization) prior to the issuance of Proclamation 4074. See Comment, "Attacks On The United States Import Surcharge Under Domestic and International Law: A Pragmatic Analysis," 6 *J.Int'l L. & Econ.* 269, 273 (1972); J. Jackson, *World Trade and the Law of GATT* 711 (1969).

ous emergencies have been declared and courts have sustained both the breadth of the TWEA and the constitutionality of diverse actions taken under its authority. (See note 16, *supra*.)

 The narrow interpretation adopted by the Customs Court also rests upon disregard of the phrase "or otherwise," which follows "by means of instructions, licenses,"[23] and, thus, would require a re-writing, in effect, of the statute. Judicial power does not extend that far.[24] To treat use of the phrase "or otherwise" by Congress as having been without purpose is to violate a basic rule of statutory construction. *Ex Parte Public National Bank*, 278 U.S. 101, 104, 49 S.Ct. 43, 73 L.Ed. 202 (1928).

 If the phrase "by means of instructions, licenses or otherwise" defines "the nature and mode of the regulatory authority intended to be delegated to the President," it does so very broadly indeed. The phrase appears to us to be expansive, not restrictive. The words "or otherwise," if they mean anything, must mean that Congress authorized the use of means which, though not identified, were *different* from, and additional to, "instructions" and "licenses." Congress, by its use of "or otherwise," signaled its intent not to bind the President into "instructions" or "licenses," or

into any other pre-specified means which might preclude his dealing with a national emergency and defeat the purpose of the legislation.

Demonstrably careful and extensive research into the history of § 5(b) led the author of the concurring opinion below to give weight to the lack of an indication that Congress "intended—or even considered—this section as a vehicle for delegating any of its tariff-making authority." However, we do not find it surprising that Congress did not *specify* that the President could use a surcharge in a national emergency. Having left the battlefield, it would hardly do to dictate all the weapons to be used in the fight. Nor do we find anything in the inconclusive and hurried legislative history of § 5(b) which indicates an intent to prohibit action such as that reflected in Proclamation 4074.

 We conclude, therefore, that Congress, in enacting § 5(b) of the TWEA, authorized the President, during an emergency, to exercise the delegated substantive power, i. e., to "regulate importation," by imposing an import duty surcharge or by other means appropriately and reasonably related, as discussed below, to the particular nature of the emergency declared. Whether a delegation of such breadth as to have au-

---

**23.** Appellant argues that the import duty surcharge can be considered an "instruction" or a blanket "license" to all who are willing to pay it. Such a strained interpretation is unnecessary, in view of the statutory words "or otherwise." However, we would note that a proclamation setting up individual licenses available to individual importers who would pay a 10% "license fee" would appear to satisfy the need for licensing envisaged by the Customs Court. Under that view, a holding that the surcharge herein was ultra vires would be tantamount to a holding that the President was not authorized, under the TWEA, to do in one stroke what he was fully authorized to do seriatum, i. e., he could not do efficiently that which he was authorized to do only inefficiently.

We note, also, that the "license fee" mechanism involved in *Algonquin SNG, Inc. v. Federal Energy Administration*, 518 F.2d 1051, (D.C.Cir. 1975), *cert. granted*, 423 U.S. 923,

96 S.Ct. 265, 46 L.Ed.2d 249 (1975) (No. 75–382) was described by the United States Tariff Commission in its report, *World Oil Developments and U. S. Oil Import Policies*, T.C. Publication 632, at 97 (1973), as a "duty system."

**24.** The opinion below does not interpret "or otherwise," except perhaps inferentially in its reference to "the construction contended by the defendant."

For a judicial interpretation of the words "or otherwise," see *Dunham v. Omaha & Council Bluffs Street Ry. Co.*, 106 F.2d 1, 3 (2nd Cir. 1939), *cert. denied*, 309 U.S. 661, 60 S.Ct. 513, 84 L.Ed. 1009 (1940).

We note, also, the congressional use in § 5(b) of "or otherwise" after "through any agency that he may designate." It would be difficult to hold, for example, that § 5(b) requires the President to use an "agency."

thorized Proclamation 4074 would be constitutionally embraced, is determined, however, by the nature of the particular surcharge herein and its relationship to other statutes, as well as by its relationship to the particular emergency confronted.

### Limited Nature of Proclamation 4074

In its proper concern for adherence to the Constitution, the Customs Court erred, we believe, in its expressed fear that, if Proclamation 4074 were upheld, the President, by "merely" declaring a national emergency, "could determine and fix rates of duty at will, without regard to statutory rates prescribed by Congress." The concurring opinion expressed the same unease in these words:

> Furthermore, a finding that the President has the power under section 5(b) to impose whatever tariff rates he deems desirable simply by declaring a national emergency would not only render our trade agreements program nugatory, it would subvert the manifest Congressional intent to maintain control over its Constitutional powers to levy tariffs.

As was said in *Falcon Sales Company v. United States,* 199 F.Supp. 97, 102, 47 Cust.Ct. 129, 136, C.D. 2292 (1961) presidential actions must be judged in the light of what the President actually *did,* not in the light of what he could have done. To this we would add, "and not in the light of what he *might do.*" Each Presidential proclamation or action under § 5(b) must be evaluated on its own facts and circumstances. To uphold the specific surcharge imposed by Proclamation 4074 is not to approve in advance any future surcharge of a different nature, or any surcharge differently applied or any surcharge not reasonably related to the emergency declared.

Proclamation 4074, far from fixing rates in disregard of congressional will, specifically provided, as noted above, "that if the imposition of an additional duty of 10 percent ad valorem would cause the total duty or charge payable to exceed the total duty or charge payable at the rate prescribed in column 2 of the Tariff Schedules of the United States, then the column 2 rate shall apply."

Further, the surcharge was limited to articles which had been the subject of prior tariff concessions and, thus, to less than all United States imports. It resulted in a range of effective surcharge rates and duties. The surcharge rate on automobiles, for example, became 6.5% ad valorem. S.Rep. No. 92-437, 92d Cong., 1st Sess. 14 (1971) U.S.Code Cong. & Admin.News 1971, p. 1825.[25] With respect to some articles the surcharge could result in the precise statutory duty set by the Congress. If a prior concession had reduced the statutory rate by 10% ad valorem, the imposition of the 10% ad valorem surcharge would produce the statutory rate of column 1 in the Tariff Schedules. As Proclamation 4074 recognized, the duty rate after the surcharge might become that of column 2 for other articles. With respect to some other articles, the surcharge might result in a duty set by one of a series of earlier concessions following presidentially negotiated trade agreements. In the case of still other articles, the total duty under Proclamation 4074 might be less than that resulting from a rate set by Congress and different from that resulting from prior tariff concessions.

With respect to those articles on which no concession had been granted, the congressionally established rates remained untouched. And the limitation to "dutiable" articles meant that no duties were created on goods entitled to free entry under the statute. Far from attempting,

---

25. "When all exceptions to the 10-percent rule were taken into account, the effective rate of surcharge came down to 4.8 percent." Economic Report of the President 70 (1972). The amount collected under the surcharge was reported to be approximately $500 million. Wall St. Journal, July 9, 1974, at 3, col. 1.

therefore, to tear down or supplant the entire tariff scheme of Congress, the President imposed a limited surcharge, as "a temporary measure" (see footnote 4, supra) calculated to help meet a particular national emergency, which is quite different from "imposing whatever tariff rates he deems desirable."[26]

*Relationship to Other Statutes*

Reliance by the Customs Court on *Youngstown Sheet & Tube,* as quoted above, is misplaced. We do not have here, as was the case in *Youngstown,* what the Customs Court described as "legislative acts providing procedures prescribed by the Congress for the accomplishment of the very purpose sought to be obtained" by a Presidential Proclamation. The surcharge did not run counter to any explicit legislation. We know of no act, other than the TWEA, "providing procedures" for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971.

Congress has provided numerous acts touching upon the regulation of imports. The Tariff Act of 1930 and its amendments, the Trade Agreements Act of 1934, and its amendments, and the Trade Expansion Act of 1962 all provide tariff-making authority to the President,[27] albeit with various limitations. Those trade acts were viewed by the Customs Court as indicating a congressional intent that such limitations should apply to any delegation of its tariff making authority.[28] Those acts, however, are applicable to normal conditions on a continuing basis. The existence of limited authority under certain trade acts does not preclude the execution of

other, broader authority under a national emergency powers act. Though § 5(b) of the TWEA does overlap the traditional framework of trade legislation, it is not controlling that some of the same considerations are involved. That is to be expected. All deal with foreign commerce. Congress has said what may be done with respect to foreseeable events in the Tariff Act, the TEA, and in the Trade Act of 1974 (all of which are in force) and has said what may be done with respect to unforeseeable events in the TWEA. In the latter, Congress necessarily intended a grant of power adequate to deal with national emergencies. It was error below to apply the same approach to determination of intent when Congress is legislating for normal conditions (where the grant is properly narrow) and when Congress is legislating for national emergency conditions (where the grant must be of greater breadth). We find it unreasonable to suppose that Congress passed the TWEA, delegating broad powers to the President for periodic use during national emergencies, while intending that the President, when faced with such an emergency, must follow limiting procedures prescribed in other acts designed for continuing use during normal times.

*Relation to the Power Delegated and the Emergency Declared*

A standard inherently applicable to the exercise of delegated emergency powers is the extent to which the action taken bears a reasonable relation to the power delegated and to the emergency giving rise to the action. The nature of the power determines *what* may be done and the nature of the emergen-

---

26. A charge on imports will inherently produce revenue. As stated by the President, however, "The surcharge was not imposed to raise revenue but to provide the U. S. external position with some temporary protection." Economic Report of the President 70 (1972).

27. For a review of congressional delegations of tariff regulating powers, see 7 *Vand.J.Transnat'l L.* 137, at 155 et seq. (1973).

28. Appellant's argument below, that the surcharge was within the termination powers of the President under the TEA and the Tariff Act, would, if sustained, permit surcharges at any time the President wished. That contention should not, however, be permitted to influence consideration of the TWEA. The concept that Congress must surround every delegation with detailed limitations is at war with the flexibility imperative inherent in the delegation of emergency powers.

cy restricts the *how* of its doing, i. e., the means of execution. Though courts will not normally review the essentially political questions surrounding the declaration or continuance of a national emergency, they will not hesitate to review the *actions* taken in response thereto or in reliance thereon.[29] It is one thing for courts to review the judgment of a President that a national emergency exists. It is another for courts to review his acts arising from that judgment.

■■■■ It is clear that the surcharge herein had, as its primary purpose, the curtailment, i. e., the regulation, of imports. What was sought was an offset to actions of our foreign trading partners which had led to loss of our favorable balance of trade and to a serious negative balance, as the President's address, supra note 4, made plain. Pressure exerted by the surcharge contributed to achievement of a multilateral agreement of major nations,[30] which included a realignment of currency exchange rates. As was indicated in *South Puerto Rico Sugar Co. Trad. Corp. v. United States,* 334 F.2d 622, 167 Ct.Cl. 236 (1964), it is purpose, not form, which should govern judicial characterization of a charge on imports. Cf. *Moon v. Freeman,* 379 F.2d 382, 391 (9th Cir. 1967). A principal function and necessary effect of the import surcharge in Proclamation 4074 was to regulate imports. Section 5(b) delegated power to "regulate importation." The relationship between the action taken and the power delegated was thus one of substantial identity.

■■■■ The President's choice of means of execution must also bear a reasonable relation to the particular emergency confronted. In considering section 3 of the Tariff Act of 1890, which authorized the President, in non-emergency situations, to impose retaliatory measures at his discretion "for such time as he shall deem just," the Supreme Court, after noting the fact finding limitation normally involved in peacetime delegations, said in *Field v. Clark,* 143 U.S. 649, 691, 12 S.Ct. 495, 504, 36 L.Ed. 294 (1892):

> [I]n the judgment of the legislative branch of the government, it is often desirable, if not essential, for the protection of the interests of our people, against the unfriendly or discriminating regulations established by foreign governments, in the interests of their people, to invest the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations.

The "discriminating regulations * * * in the interests of their people" referred to in *Field* may be likened to the "unfair exchange rates," "unfair treatment" and "the unfair edge" which the President described in his address, supra note 4, as causing the United States "to compete with one hand tied behind her back" and

---

**29.** That the courts stand ready to inhibit actions *not* reasonably related to the authority granted in the TWEA is illustrated by *Real v. Simon,* 510 F.2d 557 (5th Cir. 1975), wherein the Cuban Assets Control Regulations issued under the authority of § 5(b) of the TWEA had been employed to block a securities account in which a deceased Cuban national was alleged to have an interest. The court held such application of the regulations inconsistent with the legislation from which they receive their power and that the Secretary of the Treasury had exceeded his statutory authority in so interpreting and applying the provisions of the TWEA.

Though we agree fully with the Customs Court's statement that it is a "duty of the courts to hold the exercise of delegated congressional powers within the confines prescribed by the Congress," we think the performance of that duty should be limited to clear instances of the breach of such confines. Unlike *Real,* the present case is not such an instance. See also, *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), concerning review of executive actions under the Administrative Procedure Act.

**30.** See note 6, *supra.*

as the "major reason why our trade balance has eroded."

That the surcharge herein had overtones of foreign relations and foreign policy seems self-evident. As the world has grown smaller and trade more complex, foreign exchange rates, international monetary reserves, balances of payments, and trade barriers have become increasingly intertwined, with trade barriers being used as tools in furtherance of foreign policy. See the Congressional findings which appeared in § 2 (50 U.S.C. App. § 2401) of the Export Administration Act of 1969, 83 Stat. 841 (50 U.S.C. App. § 2401–13). The Customs Court appreciated that the nature of the surcharge action converged with presidential representation of the United States in the "society of nations" and with the President's efforts to achieve "stability in the international trade position" of our country. The declared national emergency was premised on a prolonged .decline in our country's international monetary reserves, the serious threat to our trade position, and our unfavorable balance of payments position. Unlike quotas and other forms of action, a surcharge can obviously be quickly imposed and removed, is not discriminatory among nations affected, and is administratively less complex.[31] Through its impact on imports, the surcharge imposed by Proclamation 4074 had a direct effect on our nation's balance of trade and, in turn, on its balance of payments deficit and its international monetary reserves. We conclude, therefore, that the President's action in imposing the surcharge bore an eminently reasonable relationship to the emergency confronted.

### Constitutionality

It should be understood, in considering the constitutionality of the TWEA as here interpreted, that the President's imposition of the surcharge could not violate any individual's constitutional rights in foreign trade. No one has a vested right to trade with foreign nations. *Buttfield v. Stranahan,* 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525 (1904); *Abby Dodge,* 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390 (1912); *Brolan v. United States,* 236 U.S. 216, 35 S.Ct. 285, 59 L.Ed. 544 (1915); *Weber v. Freed,* 239 U.S. 325, 36 S.Ct. 131, 60 L.Ed. 308 (1915); *Board of Trustees v. United States,* 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1933). And no one has a legal right to the maintenance of an existing rate or duty. *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933). Nor are we faced here with denial or infringement, even indirectly, of any right arising from any of the Amendments to the Constitution, as were the courts, for example, in *Veterans & Reserv. For Peace In Vietnam v. Regional Com'r,* and *Teague v. Regional Commissioner of Customs, supra* note 16, wherein detention, under § 5(b), of publications sent from North Vietnam was upheld against a claim of violation of First Amendment rights, or in *Sardino v. Federal Reserve Bank of New York, supra* note 16, wherein blocking of property, under § 5(b), was found not to be a deprivation of property violative of the Fifth Amendment.

The Customs Court, as quoted above, perceived a constitutional flaw in § 5(b) of the TWEA if it were interpreted as permitting the surcharge herein, viewing such interpretation as a denial of the people's right to a government of separated powers, i. e., that Congress' delegation in § 5(b), unless restricted to "licensing," would be a violation of the "delegation doctrine." Whatever may be the current viability of that doctrine (see note 14, *supra* ), we find no conflict therewith in the TWEA as applied to Proclamation 4074. The Supreme Court in *Hampton & Co. v. United States,* 276

---

**31.** The relationship between quotas and surcharges, as counterfoils to balance of payments problems, is described in Vincke,

"Trade Restrictions for Balance of Payments Reasons and the GATT: Quotas v. Surcharges," 13 *Harv.Int'l L.J.* 289, 312–13 (1972).

U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), dealing with non-emergency conditions, found those delegations proper which laid down an "intelligible principle" under which the President was to act. We find that principle, as did the court in *Veterans & Reserv. For Peace In Vietnam v. Regional Com'r, supra,* in the express limitations that (1) § 5(b) of the TWEA shall become operative only in "time of war" or "any other period of national emergency declared by the President" (i. e., a congressional requirement that the President, before acting in peacetime, must find and declare the fact that a national emergency exists), and (2) that the power delegated therein shall be applied only to "property in which any foreign country or a national thereof has any interest."

 It cannot be lightly dismissed that the TWEA is operative only during (war or) national emergencies,[32] which inherently preclude prior prescription of specific, detailed guidelines. Even in relation to *tranquil,* non-emergency conditions, the more modern view of the "delegation doctrine" was stated by the Supreme Court in *American Power Co. v. S. E. C.,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946), in these words:

The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations.

Clearly, Congress can be "constitutionally required to appraise beforehand the myriad situations" even less stringently when legislating with respect to the inherently unknown and unknowable problems which may accompany a future national emergency.

 The need for prompt action, another essential feature of a national emergency, precludes the otherwise oft-provided requirement for prior hearings, extensive fact finding, Tariff Commis-

---

**32.** We agree with the Customs Court that courts will not review the bona fides of a declaration of an emergency by the President. Judicial suspicion should not form a basis of decision. *Teague v. Regional Com'r of Customs, Region II, supra* note 16; *Sardino v. Federal Reserve Bank of New York, supra* note 16; *Werner v. United States,* 119 F.Supp. 894 (S.D.Cal.1954), *aff'd,* 233 F.2d 52 (9th Cir.), *cert. denied,* 352 U.S. 842, 77 S.Ct. 65, 1 L.Ed.2d 58 (1956). For a discussion of the advisability of such judicial review see Recent Decisions, *supra* note 11, at 667 where, in commenting on this case, the suggestion appears that such review would avoid "linguistic and policy distorting difficulties." Though the Congress has amended the TWEA twice since 1933, it has not seen fit to attempt the definition of what constitutes an "emergency" thereunder, and has not seen fit to impose either pre-conditions or post-conditions on its declaration. We note that the TWEA is just one out of 470 provisions of Federal Law which delegate emergency powers to the President.

See S.Rep.No.93–549, 93d Cong., 1st Sess. III (1973). For a discussion of judicial reluctance to hold that an emergency has in fact terminated, in the absence of a presidential or congressional announcement to that effect, see *Garson & Miller, supra* note 11, at 151–57. See also, Comment, "The United States Response to Common Market Trade Preferences and the Legality of the Import Surcharge," 39 *U.Chi.L.Rev.* 177, 232 (1971).

For post-action controls which Congress could apply to emergency powers, see, e. g., the reporting provisions in § 103 of the Mutual Defense Assistance Control Act of 1951, 65 Stat. 645 (22 U.S.C. § 1611b(b)), and the similar provisions of § 122(b) of the Trade Act of 1974 (19 U.S.C. § 2132(b)), *supra* note 15.

The long, continuing parade of emergencies of the last 30 years makes prophetic the dictum of the Ninth Circuit in *Bauer v. United States,* 244 F.2d 794, 797 (1957), that we may "grow used to them as the fittings of normal existence."

sion reports to the President, and the like. Emergencies, by definition, require a quick, decisive response. Of the three branches of government, only the Executive has a continuing, spontaneous capability for mounting such a response. Further, emergencies are expected to be shortlived.[33] As the court said in upholding the constitutionality of § 5(b) in *Nielsen v. Secretary of the Treasury,* 424 F.2d at 843:

> Nevertheless, it is also true that it may be reasonable and hence valid for a government to take more drastic measures in time of emergency, *especially when they are reasonably limited in time,* than it would propose or justify as permanent legislation. See, e. g., *Yakus v. United States,* 321 U.S. 414, 441, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481 (1934); *Wilson v. New,* 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755, L.R.A.1917E, 938 (1917). [Emphasis added.]

That § 5(b) and Proclamation 4074 deal only with *foreign* goods also is of significance. The Supreme Court, though dealing with international relations and the sale of arms rather than with imports, and with normal rather than national emergency conditions, in *Curtiss-Wright Export Corp., supra,* recognized the distinction between delegations of power in foreign and domestic affairs in these words (299 U.S. at 320, 57 S.Ct. at 221):

> It is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.[34]

■ Congress, by delegating to the President in § 5(b) the power to regulate imports within the national emergency powers standard, has not succeeded in abdicating its constitutional power to regulate foreign commerce. It remains the ultimate decision maker and the fundamental reservoir of power to regulate commerce. It may, of course, recall or limit the delegated emergency power at any time. Throughout the 114 year life of the TWEA and its progenitors, Congress has repeatedly exercised its untrammeled plenary power over foreign commerce.

■ Exercise of the regulatory power by the President differs substantially from its exercise by the Congress.[35] Unlike congressional freedom of exercise, Presidential exercise is limited to actions consistent with the national

---

**33.** Though the surcharge itself was described by the President as a temporary measure, and though it was in effect less than five months, we note that Proclamation 4098, which terminated Proclamation 4074, did not terminate the declared emergency. So far as imposition of a surcharge is concerned, however, the failure to terminate the emergency has been rendered moot by Congressional enactment of § 122(a) of the Trade Act of 1974, Pub.L.No.93–618 (Jan. 3, 1975), 88 Stat. 1978, 1987 (19 U.S.C. § 2132), specifically requiring the President, within certain parameters, to impose a surcharge or quotas in response to balance of payments problems. A surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action.

We draw no conclusions, regarding the existence of authority for Proclamation 4074 in 1971, from the specific grant of the surcharge authority spelled out in the Trade Act of 1974. Cf. *Wong Yang Sung v. McGrath,* 339 U.S. 33, 47–48, 70 S.Ct. 445, 94 L.Ed. 616 (1950).

**34.** *Curtiss-Wright* was decided within a year after the decision in *Panama Refining,* relied upon by the Customs Court as requiring the application of rigid standards to the delegation in § 5(b). It may be noted that *Panama Refining* dealt with *Domestic* affairs (National Industrial Recovery Act of 1933, 48 Stat. 195).

**35.** We note that the Congress, in delegating the power over importation in § 5(b), elected to employ the same word, "regulate," which the people employed in delegating the power over commerce to the Congress under the Constitution in 1789. For the reasons cited herein, we do not, of course, consider the delegations co-equal.

emergency purpose of § 5(b). Further, the President, unlike Congress, is required to take a political step, the declaring of a national emergency, before acting. Finally, both Congress and the President are bound by the Constitution, but the President must also avoid action in conflict with prior governing statutes. *Youngstown Sheet and Tube, supra,* and *United States v. Guy W. Capps, Inc.,* 204 F.2d 655 (4th Cir. 1953), *aff'd on other grounds,* 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329 (1955).

■ The mere incantation of "national emergency" cannot, of course, sound the death-knell of the Constitution. Nor can it repeal prior statutes or enlarge the delegation in § 5(b). The declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules, as it was not in this case. We agree, also, with the statement of the court in *Algonquin SNG, Inc. v. Federal Energy Administration,* 518 F.2d 1051, 1062 (D.C.Cir. 1975), *cert. granted,* 423 U.S. 923, 96 S.Ct. 265, 46 L.Ed.2d 249 (1975) (No. 75–382), that: "Our laws were not established merely to be followed only when times are tranquil." The TWEA, which is among "our laws" and is designed specifically for non-tranquil times, was not before the court in *Algonquin.*[36] As we have noted, if *every* law applicable to tranquil times were required to be followed in emergencies, there would be no point in delegating emergency powers and no adequate, prompt means for dealing with emergencies.

■ The Executive does not here seek, nor would it receive, judicial approval of a wholesale delegation of legislative power. Nor do we find in § 5(b) the grant of the "unrestrained and unbridled" authority feared by the Customs

Court. The courts continue to sit and remain prepared, as was the court in *Real, supra* note 29, to impede an unreasonable or ultra vires exercise of the power granted in § 5(b). We do not here sanction the exercise of an unlimited power, which, we agree with the Customs Court, would be to strike a blow to our Constitution. On the contrary, we find ourselves in agreement with this statement of the Court of Claims in *South Puerto Rico Sugar Co. Trad. Corp.* (334 F.2d at 632):

[W]hen Congress uses far-reaching words in delegating authority to the President in the area of foreign relations, courts must assume, unless there is a specific contrary showing elsewhere in the statute or in the legislative history, that the legislators contemplate that the President may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the Act. In a statute dealing with foreign affairs, a grant to the President which is expansive to the reader's eye should not be hemmed in or "cabined, cribbed, confined" by anxious judicial blinders. [Footnote omitted.]

### Conclusion

■ The broad and flexible construction given to § 5(b) by the courts which have considered it is consistent with the intent of Congress and with the broad purposes of the Act. As was said by the Supreme Court in discussing the President's power to define "banking institution" under an earlier version of § 5(b): "The power in peace and in war must be given generous scope to accomplish its purpose." *Propper v. Clark,* 337 U.S. 472, 481, 69 S.Ct. 1333, 1339, 93 L.Ed. 1480 (1949). Though such a broad grant may be considered unwise, or even dan-

**36.** That court had before it only 19 U.S.C. 1862(b), originally enacted as § 7 of the Trade Agreements Extension Act of 1955 (69 Stat. 162, 166) and now found in the Trade Expansion Act of 1962, as amended. Though § 1862(b) refers to threats to "national securi-

ty" it is among the permanent trade laws applicable to non-emergency situations and does not involve use of the authority delegated in the TWEA upon declaration of national emergency.

gerous, should it come into the hands of an unscrupulous, rampant President, willing to declare an emergency when none exists,[37] the wisdom of a congressional delegation is not for us to decide. As was said in *Norman v. B. & O. R. Co.,* 294 U.S. 240, 297, 55 S.Ct. 407, 411, 79 L.Ed. 885 (1935), with respect to "gold clause" measures: "We are not concerned with their wisdom. The question before the Court is one of power, not of policy."

Congress, fully familiar with its own use of duties as a means of regulation, delegated to the President, in § 5(b) of the TWEA, the power to regulate importation during declared national emergencies by means appropriate to the emergency involved. Interpreted as having authorized the President's imposition of the specific surcharge in Proclamation 4074, as a reasonable response to the particular national emergency declared therein, the delegation in § 5(b) of the TWEA passes constitutional muster.

Accordingly, the President's action under review was within the power constitutionally delegated to him, and the judgment of the Customs Court that said action was ultra vires must be reversed.

*Reversed.*

---

**37.** The growth of power in the Executive has been phenomenal over the last 40 years. The risks inherent in a concentration of power in the Executive remain those feared by the Framers. The Federalist, Nos. 48–49 (Madison). Recent events have brought the question into wider public discourse. Whether Congress should devote more effort to defining, limiting or regaining powers previously delegated is not a matter within the jurisdiction of the courts. Whether the pendulum of power should now begin to swing further in the direction of the Congress is a matter of policy, reserved to the people and their elected representatives in the Congress. Absent a violation of the Constitution, or action contrary to statute, it is not grist for the mill of this court.