## HUGO STINNES STEEL AND METALS CO.

*v.*

## UNITED STATES.

**C.D. No. 4753.**
**Court No. 73-2-00485.**

United States Customs Court.

June 20, 1978.

Rode & Qualey, New York City (Ellsworth F. Qualey, New York City, of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C. (Saul Davis, trial atty., New York City), for defendant.

BOE, Judge:

The plaintiff has filed a motion for summary judgment contesting the imposition of a supplemental duty in the amount of 10% ad valorem under item 948.00, Tariff Schedules of the United States, pursuant to Presidential Proclamation 4074, 36 F.R. 15724 (1971). The merchandise upon which the supplemental duty was assessed consisted of 415 coils of cold rolled steel sheets, shipped from Japan on July 17, 1971 to Antwerp, Belgium, shipped therefrom to the United

States on September 25, 1971 and entered at the port of Toledo, Ohio on or about November 4, 1971. A protest to the assessment was filed by the plaintiff which was denied by the customs service.

The defendant has filed a cross-motion for summary judgment contending that the Commissioner of Customs properly determined that the date of exportation of the merchandise in question to the United States was the date on which the steel coils were shipped from Belgium on September 25, 1971 and, accordingly, were subject to the 10% supplemental duty provided by Presidential Proclamation 4074 and the orders, rules and regulations subsequently issued by the Secretary of the Treasury by way of implementation.

By the terms of Presidential Proclamation 4074, the supplemental duty in the amount of 10% was imposed on all dutiable articles, except those articles exempted by the Secretary of the Treasury, imported for consumption into the customs territory of the United States after 12:01 a. m., August 16, 1971. To implement the provision providing for the imposition of the supplemental duty, the Proclamation directed that subpart C be inserted immediately after subpart B of part 2 of the Appendix to the Tariff Schedules of the United States. By the terms of headnote 4(a), subpart C, authority was delegated to the Secretary of the Treasury to " * * * take action to reduce, eliminate or reimpose the rate of additional duty herein or to establish exemption therefrom * * *."

In the course of the administration of the provisions relating to the supplemental duty, it appeared that in certain circumstances equity justified a one-time, non-recurring exemption from the effective time and date of the supplemental duty as fixed by the Presidential Proclamation. Accordingly, on August 31, 1971, the Secretary of the Treasury issued Additional Duty Order No. 3, 36 F.R. 17667 (1971), providing the following exemption from the imposition of the supplemental duty:

*Headnote 5, subpart C, part 2, Appendix to the Tariff Schedules of the United States:*

5. *Articles exempt from the additional duties.*—In accordance with determinations made by the Secretary in accordance with Headnote 4(a), the following described articles are exempt from the provisions of this subpart:

* * * * * *

(h) Articles exported to the United States before 12:01 a. m., August 16, 1971, * * *.

The issue presented to the court in this action, accordingly, is whether the merchandise in question, entered into the United States at Toledo, Ohio on November 4, 1971 was "exported to the United States before 12:01 a. m., August 16, 1971" within the intendment of Additional Duty Order No. 3 promulgated by the Secretary of the Treasury.

In the determination of the foregoing issue, the defendant contends that this court is restricted only to a review of the administrative record to determine whether the decision of the Commissioner of Customs was reasonable. This position of the government is predicated upon Additional Duty Order No. 3 which, the defendant maintains, conferred upon the Commissioner of Customs the discretionary authority to determine what goods, in fact, were "exported to the United States before 12:01 a. m., August 16, 1971." Additional Duty Order No. 3 provided in pertinent part:

By virtue of the authority vested in the Secretary of the Treasury, * * * the Commissioner of Customs, with the approval of the Assistant Secretary of the Treasury (Enforcement, Tariff and Trade Affairs, and Operations) is authorized to prescribe such regulations and issue such instructions as may be necessary to carry out the purposes of this order.

I

Recently, the government has been urging with increased frequency that decisions made by the Secretary of the Treasury and the Commissioner of Customs of the character presently under consideration

may be reviewed only with respect to the reasonableness thereof. From whence such a construction has had its origin is not suggested or explained. No applicable authority for this position has been cited by the defendant.[1] Nor has this court independently been able to discover any authoritative support therefor. On the contrary, the defendant's construction as to the extent of this court's scope of review in a proceeding of this character is neither consistent with existing statute relating to trial procedure in this court, nor with the historical and accepted practice, particularly in proceedings seeking a determination as to the applicability of a rate of duty upon imported merchandise. The intent of Congress, indeed, is clear as to the extensive character of the judicial review it assures a litigant in any proceeding before the United States Customs Court. 28 U.S.C. § 2637(a) provides:

> In *any* proceeding in the Customs Court, under rules prescribed by the court, the parties and their attorneys *shall* have an opportunity to introduce evidence, to hear and cross-examine the witnesses of the other party, and to inspect all samples and all papers admitted or offered as evidence, * * *. [Emphasis added.]

■ However, the defendant urges that the instant action should be considered outside the usual framework of cases presented to this court because the administrative decision denying plaintiff's protest was based upon an interpretation of an intra-executive department directive—Additional Duty Order No. 3. To so characterize the Order of the Secretary of the Treasury is a gross misconception. Presidential Proclamation 4074 and Additional Duty Order No. 3 became a part of the Tariff Schedules of the United States. Each with respect to the supplemental duty and its application was the legal equivalent of a Congressional enactment. The 10% supplemental duty was not restricted to specific or a limited number of tariff provisions, but applied generally on all dutiable articles imported into the United States except those which the Secretary of the Treasury was authorized to exempt. The powers exercised by the President and the Secretary of the Treasury were not inherent in and to the Executive Branch of government, but rather were exercised by and through the authority initially delegated by the Congress. *See United States v. Yoshida International, Inc.*, 526 F.2d 560, 63 CCPA 15, C.A.D. 1160 (1975).

■ In the same manner as any importer seeks an adjudication of the proper rate of duty assessed by the customs service on specific merchandise imported into the United States by the filing of a protest and upon denial thereof by a trial on the record before the Customs Court, so the plaintiff in the instant proceeding, upon the denial of its protest, seeks an adjudication in a trial on the record with respect to its liability for the "additional duty" imposed by Presidential Proclamation 4074 on the specific merchandise imported.

## II

■ In determining, therefore, whether the merchandise in question had been "exported to the United States" before the date and time specified in Presidential Proclamation 4074 and within the intendment of the exemption provided in Additional Duty Order No. 3, it is proper to not only consider the record examined by the Commissioner of Customs in making his determination in the within proceedings, but also the evidence submitted by way of depositions together with the various exhibits presented to this court in connection with this proceeding.[2]

---

1. The defendant's purported reliance upon *Suwannee Steamship Co. v. United States*, 435 F.Supp. 389, 79 Cust.Ct. 19, C.D. 4708 (1977), is clearly misplaced. The decision did not involve the rate or amount of duty owed on imported merchandise. Indeed, the *Suwannee* case did not involve any importation into the United

States, but rather related to a question of repairs made upon an American vessel in a foreign port. The former decision of this court can in no manner offer persuasive support of the contention of the defendant herein.

2. In support of its motion for summary judg-

In February 1971, Heine Bros., Ltd., an English trader in steel, offered to sell to La Metallurgie Liegeoise, a Belgian steel trader, a quantity of cold rolled steel sheets in coil. Heine Bros., in turn, had been offered the steel from Koyo Boeki Co., Ltd., a Japanese steel trader, which steel was to be manufactured in Japan by Nippon Steel Corp. La Metallurgie Liegeoise was given a period of time to accept the offer to purchase the steel from Heine Bros. In the course of attempting to secure buyers for the steel which it had the option to purchase, La Metallurgie Liegeoise on February 24, 1971 offered to sell to the plaintiff 2,000 metric tons (m/t) of cold rolled steel sheets in coils. On May 5, 1971, presumably after negotiations with respect to the total amount of the purchase had been completed, the plaintiff sent its order to La Metallurgie for 11,000 m/t of the steel coils.

The plaintiff's order specified "Nippon Steel Corp., Japan" as the origin of the steel. The total order was subdivided into six different order numbers—10555, 10556, 10557, 10558, 10559 and 10562. Each order number related to the destination in the United States to which the respective designated quantities of steel were to be delivered. The merchandise in question in this proceeding relates, however, only to orders numbers 10555 and 10556. The price for the merchandise was specified in United States dollars per m/t and insurance at 115% of the sales price in United States dollars was stipulated. The terms of the sale were "CIF free out Antwerp."[3] The order specified that the goods be exported from Japan prior to July 31, 1971. The order also required that the merchandise be marked for transshipment to designated ports in the United States in accordance with a schedule which was attached to the order consisting of a separate and individual page for each of the six different order numbers. The respective pages dealing with order numbers 10555 and 10556, the merchandise in question, indicated at the top of the page that the quantity of steel specified therein was intended for transshipment to Toledo, Ohio. Each coil of steel included in the respective order numbers was to be marked by means of two metal tags. Each tag was to indicate the order number, 10555 or 10556, the specification and also the designation Antwerp/Alpha. Other distinctive designations such as "Antwerp/Beta" and "Antwerp/Gamma" were specified on each tag for merchandise destined to other United States ports. The steel coils, a total of 148, included in order number 10555, were to be further identified by means of two red color strokes on each tag; the steel coils, a total of 267, included in order number 10556, were to be further identified by means of two yellow color strokes on each tag.

Plaintiff's agreement with La Metallurgie called for payment by means of an irrevocable letter of credit. In accordance therewith, an irrevocable and transferable letter of credit was opened on plaintiff's account by the Bank of America in New York on June 10, 1971, for the benefit of La Metallurgie Liegeoise. This letter of credit was amended on June 18, 1971. The tenor of the credit provided for the honoring of La Metallurgie's time drafts 60 days after the date of the bills of lading on Banque de Bruxelles in Liege, Belgium. Further terms of the letter of credit required that the steel be shipped from Japan CIF free out Antwerp; that shipment from Japan occur by July 31, 1971; and that the insurance policy or certificate cover all risks including war and strikes, riots, and civil commotions in an amount equal to 115% of

---

ment, the plaintiff offered the depositions of four witnesses: Camille Brasseur, the president of La Metallurgie Liegeoise, the Belgain steel trading firm which sold the steel involved herein to the plaintiff; Roger Roggeman, the export manager of Neptune, S.A., the international freight forwarder which handled the steel while it remained in Antwerp; and Lothar Gue and Eva Houlihan, respectively the sales manager and assistant sales manager of the plaintiff in 1971, the year of the subject importations.

3. By said terms, the seller was required to pay the charges for insurance and freight with respect to the merchandise to the point of destination, Antwerp. Charges for unlading the merchandise from the charter vessel were to be borne by the purchaser.

the sales value of the merchandise payable in U.S. dollars.

While negotiating with La Metallurgie Liegeoise for the purchase of the steel, the plaintiff was securing purchasers for the same steel in the United States. One of these U.S. buyers was Barsteel, a division of U.S. Industries. On May 13, 1971, the plaintiff confirmed Barsteel's order for approximately 5,000 m/t of the steel coils divided under sales contract numbers 10555 (1,750 m/t) and 10556 (3,000 m/t). The confirmation evidences that the steel so purchased by Barsteel was similar in both description and amount with that involved in the identical order numbers—10555 and 10556—of plaintiff's contract with La Metallurgie. The written agreement with Barsteel did not specify Japan as the country of origin of the steel. The deposition of Eva Houlihan, however, indicates that Barsteel was informed that it was purchasing Japanese steel.

All shipping arrangements for the merchandise in question from Japan to Antwerp were made by Koyo Boeki, the Japanese trader and steel exporter. Shipment from Japan to Antwerp was provided by charter vessel. Prior to the time of shipment from Japan on July 17, 1971, the steel was marked in accordance with the instructions contained in the schedule attached to plaintiff's original purchase order with La Metallurgie. The bills of lading for the shipment from Japan to Antwerp required notification with respect to shipment to be given to Neptune, an international freight forwarder in Antwerp. These documents contained the order numbers designating the specific merchandise in question, 10555 and 10556, and also the required designation "Antwerp/Alpha" together with two red color strokes on each tag contained in order number 10555, and two yellow color strokes on each tag contained in order number 10556. From the testimony adduced in the depositions, it appears that because the shipment of the merchandise in question was made by charter vessel, the bills of lading did not indicate thereon that the merchandise was to be transshipped to a destination other than Antwerp.

In the early part of July and prior to the time of the shipment of the merchandise in question from Japan, the plaintiff had made formal arrangements with Neptune to care for the merchandise as it was unladen at the pier in Antwerp, and to supervise the loading of the merchandise upon the carrier transporting the merchandise from Antwerp to the United States.

Likewise, in early July of 1971 the plaintiff entered into negotiations with Cast Steamship Company to ship the merchandise in question from Antwerp to Toledo, Ohio. It appears that a formal agreement between Cast Steamship Company and plaintiff was reached on July 26 and July 28, 1971, and by August 9, 1971 all information had been supplied to Cast Steamship Company requisite to the shipment of the merchandise in question from Antwerp to the United States. The bills of lading which were made out on that date corresponded with the information appearing on the bills of lading of the charter vessel transporting the merchandise from Japan to Antwerp. Direct reference was made on each bill of lading of Cast Steamship line to the corresponding bill of lading issued by the Japanese charter vessel.

The merchandise in question was shipped from Japan, as afore-referred to, on July 17, 1971 and arrived in Antwerp on or about September 4, 1971 where the merchandise was unladen and stored on a covered pier in the Antwerp harbor. At plaintiff's prior instruction necessary documentation was supplied by Neptune to Belgian customs officials in order to place the merchandise in question in an "in-transit" status while in Antwerp. No Belgian customs duties were paid on the merchandise. The merchandise did not leave the pier in Antwerp harbor from the time it was unladen from the charter vessel until it was again laden from transshipment to the United States. Upon arrival of the merchandise in question at Antwerp, it bore the required markings indicating the respective order numbers 10555 and 10556, the specifications, the designation "Antwerp/Alpha" and the respective

red and yellow color strokes. A small portion of the merchandise arrived in a damaged condition. The plaintiff was reimbursed for this damage by the insurance required by both its contract with La Metallurgie and by the letter of credit issued by the Bank of America. A portion of the shipment was repacked and, while on the pier in Antwerp, was marked with the additional designation "Toledo/Japan." The merchandise in question, laden aboard the vessel of the Cast Steamship line, departed Antwerp for the United States on or about September 25, 1971, arrived at Toledo, Ohio, on or about October 10, 1971 and was entered on November 4, 1971.

### III

■■■ In the consideration of the issue raised by the cross-motions herein, it is recognized that the determination of the Commissioner of Customs bears a strong presumption of correctness. *See* 28 U.S.C. § 2635(a). This presumption attaches to each fact essential to his decision. *United*

States v. New York Merchandise Co., Inc., 435 F.2d 1315, 58 CCPA 53, C.A.D. 1004 (1970); *Novelty Import Co., Inc. v. United States*, 53 CCPA 28, C.A.D. 872 (1966). Upon the plaintiff falls the burden of demonstrating by substantial evidence that this determination is incorrect.

In considering the denial of the plaintiff's protest to the imposition of the supplemental duty by the customs service, it is necessary and proper that we examine the basis upon which such a determination was made. In a letter directed to plaintiff's counsel under date of March 7, 1972, responding to counsel's contention that the decision of the District Director of Customs denying the exemption was erroneous,[4] the Commissioner set forth the standard of proof required to include the merchandise in question within the duty exemption provided in Additional Duty Order No. 3. This letter states in pertinent part:

> Your letter cites various cases in which the courts have held that merchandise produced in Country A but shipped to the

4. Plaintiff's counsel argued that the proper standard to determine entitlement to the exemption was the country of exportation criteria used for determining appraised value under 19 C.F.R. § 14.3(d) (1971), which provided that:

> Merchandise imported from one country, being the growth, production, or manufacture of another country, shall be appraised at its value in the principal markets of the country from which it is immediately imported unless it appears by the invoice, bill of lading, or other evidence that the merchandise was destined for the United States at the time of original shipment, in which case it shall be appraised at its value in the principal markets of the country from which it was originally exported.

*See also United States v. F. W. Hagemann*, 39 CCPA 182, C.A.D. 484 (1952); *W. R. Zanes & Co. et al. v. United States*, 40 Cust.Ct. 678, R.D. 9062 (1958).

Plaintiff's contention was based upon instructions issued in a telegram, dated September 3, 1971, from the Commissioner of Customs to all Regional Commissioners and District Directors of Customs regarding the method by which the date of exportation was to be determined. The telegram reads in pertinent part:

> For the purpose of determining the date of exportation under the provisions of Headnote 5(h) subpart C of part 2 of the Appendix to TSUS, the rules set forth below shall be followed:

> Where goods are exported from the country of exportation by vessel, and where the vessel lades merchandise at 2 or more ports within that country, the date of exportation for each of the shipments shall be the date upon which the shipment left the port at which it was laden. However, where a vessel lades merchandise and departs from the country of exportation, touches at one or more ports in another foreign country or countries, returns to a port in the country of exportation and then proceeds to the United States, directly or via other foreign countries, the date of exportation for all merchandise laden aboard the vessel in the country of exportation shall be the date upon which the vessel last departed that country enroute to the United States.

> "Country of Exportation" shall be determined in the manner used to determine the country wherein value in its principal markets is used in appraisement under the provisions of section 14.3(d), Customs Regulations [19 C.F.R. § 14.3(d) (1971).]

> \* \* \* \* \* \*

Plaintiff continues to rely upon this argument in its submission before this court. The defendant strenuously contends that the instructions contained in the September 3, 1971 telegram are not applicable in this case. In light of the determination the court makes herein, *see infra*, it is unnecessary to resolve this dispute.

United States by way of Country B was, for valuation purposes, the product of Country A. However, in this case the country of exportation for valuation purposes is not in issue but, rather, the question is one of establishing the fact of a legal obligation to transship the merchandise in question to the United States at the time it left Japan for purposes of applying the surcharge. * * *

In the absence of proof that the merchandise was under an absolute legal obligation to be transshipped to the United States, and could not, under any circumstances, have entered the stream of commerce in Belgium or have been transshipped to a country other than the United States, we must affirm our prior conclusion that, for purposes of the surcharge, the date of exportation to the United States was the date on which the goods were shipped from Belgium.

In support of the Commissioner of Customs' determination and the standard used by him in reaching the same, the defendant contends that in order for the merchandise in question to be exempt from the supplemental duty within the intendment of Additional Duty Order No. 3, the evidence and proof must be sufficient to establish:

(a) at the time of the shipment from Japan on July 17, 1971, the steel coils were destined for the United States.

(b) that no possibility or contingency of their diversion elsewhere existed.[5]

■ The court can neither view the evidence in the light and manner urged by the defendant nor accept the construction placed upon Additional Duty Order No. 3 by it and the Commissioner of Customs. In other contexts, the meaning of the term "export" or "exportation" has been considered by this court as well as our appellate court. In *United States v. The Natural Sugar Refining Co.*, 39 CCPA 96, C.A.D. 470 (1951), the appellate court in dealing with the allowance of a drawback stated (at 101):

An exportation is a severance of goods from the mass of things belonging to this country with the intention of uniting them to the mass of things belonging to some foreign country.

*See also Swan & Finch Co. v. United States*, 190 U.S. 143, 23 S.Ct. 702, 47 L.Ed. 984 (1903); *Avakian Bros., Inc. v. United States*, 41 CCPA 80, C.A.D. 532 (1953); *Nassau Distributing Co., Inc. v. United States*, 29 Cust.Ct. 151, C.D. 1459 (1952). Thus, in construing the meaning of the term "exported," two factors are of paramount importance: *first*, the act of shipment or severance from the country of origin, and *second*, the intention to unite the articles to a mass of goods of another country.

The conditional language of exemption used by the Secretary of the Treasury in Additional Duty Order No. 3—"exported to the United States before 12:01 a. m., August 16, 1971"—falls within this well-recognized definition. Accordingly, in the instant proceeding the merchandise in question must have been severed from the mass of goods of a foreign country (Japan) prior to the effective date of Presidential Proclamation 4074. At this point in time, the plaintiff, as the American importer, must have had the objective and demonstrable intention to next unite this merchandise to the mass of goods of the United States.

The evidence adduced on these cross-motions overwhelmingly indicates that at the time the steel coils were shipped from Japan on July 17, 1971, and, indeed, long prior thereto, the plaintiff intended that they be joined to the mass of goods of the United States and to that of no other country. The agreement between plaintiff and La Metallurgie Liegeoise for the purchase of the Japanese steel entered into on May 5, 1971,

---

**5.** At the time of oral argument, defendant's counsel indicated that the reference by the Commissioner in his letter to "* * * an absolute legal obligation to be transshipped to the United States * * *" was not meant as a legal standard but as an alternative to and a method of answering plaintiff's contention that the "country of exportation" should be applied in determining the entitlement to an exemption. Counsel indicated that the applicable standard was whether a contingency of diversion existed at the time the instant merchandise left Japan.

and confirmed by the Belgian firm on June 2, 1971, expressly specified that the merchandise in question was to be transshipped through Antwerp, Belgium, to a designated port in the United States, Toledo, Ohio. The plaintiff specified in its purchase order that each coil involved therein was to be marked with a specific order number (10555 or 10556), the designation "Antwerp/Alpha" and two color strokes. The foregoing identification was designated to facilitate its transshipment to the United States. The purchase agreement required that the merchandise in question be shipped from Japan no later than July 31, 1971. The provision in the sales agreement that shipment was to be made "CIF free out Antwerp," required La Metallurgie Liegeoise to cover both the freight and the insurance on the shipment of the steel from Japan to Antwerp *for the benefit of the plaintiff.*

The sale contract between the plaintiff and Barsteel under date of May 13, 1971, whereby the plaintiff agreed to sell the rolled steel coils to Barsteel, offers further persuasive support of plaintiff's intention at the time the merchandise was exported from Japan on July 17, 1971. It is true this contract did not specifically identify the steel to be the same steel as purchased by the plaintiff from La Metallurgie Liegeoise. Nor was the country of Japan specified as the country of origin. However, the order numbers specified in the Barsteel sale agreement, 10555 and 10556, were identical with the order numbers contained in plaintiff's purchase contract with La Metallurgie Liegeoise. The specifications and amounts of the steel under each order number were substantially the same. The testimony contained in the depositions of Lothar Gue and Eva Houlihan clearly indicates without contradiction that the steel coils which the plaintiff was selling to Barsteel were the identical steel coils which plaintiff was purchasing contemporaneously from La Metallurgie Liegeoise for shipment from Japan to Antwerp for transshipment to Toledo, Ohio.

The evidence relating to the shipment of the merchandise in question, and particularly with respect to the unlading thereof in Antwerp and the subsequent transshipment to the United States, provides further corroboration that the plaintiff never deviated in its intention to transship the goods to the United States. Prior to the shipment of the merchandise in question, the the Japanese exporter was instructed that "Neptune-Antwerp" be notified upon the shipment of the steel coils from Japan. During the first week in July 1971, and prior to the exportation of the merchandise in question from Japan, the plaintiff negotiated with Neptune with respect to the care and handling of the merchandise upon its arrival in Antwerp, and particularly with respect to the procurement of an "in-transit" certificate from Belgian customs so as to avoid the assessment of Belgian customs duties. During this same period of time, the plaintiff was also engaged in negotiation with the Cast Steamship Co. for the transshipment of the merchandise in question from Antwerp to Toledo, Ohio. These negotiations were completed by the end of July 1971, and by August 9, 1971, the Cast Steamship Co. advised that it had all the information needed to complete its various bills of lading for shipment to Toledo, Ohio. These bills of lading again corresponded directly with those covering the initial shipment of the merchandise in question from Japan to Antwerp, and expressly indicated that the steel which was to be shipped to Toledo was the identical steel as that arriving from Japan on the charter vessel S.S. MESNA identified by order numbers 10555 and 10556, and bearing the designation "Antwerp/Alpha" and the required color strokes. No evidence is contained in the entire record that from the time of its arrival in Antwerp, Belgium that its status was other than "in-transit" until it was laden on the vessel of the Cast Steamship Co., S.S. RAGNHILD, on September 25, 1971. The merchandise remained on the same pier in the port of Antwerp and was covered by an "in-transit" certificate which Neptune as the forwarding agent had procured at plaintiff's direction. No Belgian customs duties were assessed or paid.

From a review of the entire record in this proceeding, the court is unable to discern

any evidence indicating that at the time the merchandise in question was shipped from Japan on July 17, 1971, the plaintiff had any intention *other* than to transship the same to the United States upon its arrival in Antwerp. On the contrary, the evidence indicates without contradiction that at the time the merchandise was shipped from Japan, the intention of the plaintiff, in fact, had ripened into an executory contract to transship the merchandise in question from Antwerp to the United States, and deliver the same to Barsteel at Toledo, Ohio.

### IV

The defendant, however, maintains that notwithstanding the sale agreement with respect to the merchandise in question entered into between the plaintiff and Barsteel prior to the date of its shipment from Japan, a significant contingency existed that the merchandise might be diverted elsewhere than the intended port of Toledo, Ohio. Such a contingency of diversion, the defendant urges, would preclude the plaintiff from claiming an exemption from the supplemental duty as provided by Additional Duty Order No. 3.

As evidence of this contingency, the defendant points to the following facts adduced from the record: (1) the bills of lading upon the merchandise covering the shipment of the steel by charter vessel from Japan to Antwerp did not list the United States as the ultimate destination; (2) the plaintiff inspected the merchandise on the pier in Antwerp and caused some damaged coils to be repacked; (3) the plaintiff paid for the steel purchased from La Metallurgie Liegeoise after receiving it in Antwerp.

In the presentation of this contention, the defendant appears to consider a contingency of diversion to be an element of proof separate and distinct from the question of plaintiff's intention to transship the merchandise in question to the United States, and, accordingly, to be an independent, affirmative legal requirement under Additional Duty Order No. 3. It is the opinion of this court that the proof of intent of the plaintiff as an importer and the contingency of a diversion of the merchandise in question are closely related but not separate and individual elements of proof. The presence in the record of evidentiary facts constituting such a contingency of diversion, as would tend to negate the existence of a continuing intention to transship the merchandise in question on the part of the plaintiff, is a matter which concerns the weight and the sufficiency of all of the evidence presented.

Again, from a close examination of all of the evidence, it appears that the facts which have been specifically advanced by the defendant as constituting a contingency of diversion do not serve to negate the full and continuing intention of the plaintiff to transship the steel coils to the United States from the time that they were exported from Japan.

From the exhibits comprising the record in this case, it is clear that the bills of lading covering the merchandise in question as it was shipped by a charter vessel from Japan to Antwerp did not indicate the United States to be the ultimate destination. The designations contained thereon were the notations "port of discharge"—"Antwerp." After the notation "destination: (if goods to be transshipped at port of discharge)," the space provided was blank. The defendant urges that the latter omission indicates that the merchandise was not destined for the United States when it left Japan.

While the entries on commercial documents such as invoices and bills of lading are often the most persuasive evidence of the intention of the parties, they are not conclusive with respect thereto. This court in other proceedings has received extrinsic evidence which might more accurately reflect the nature of the transaction involved. *See T. M. Duche & Sons, Inc., et al. v. United States*, 49 Cust.Ct. 377, R.D. 10325 (1962); *W. R. Zanes & Co. et al. v. United States, supra; United States v. Meadows, Wye & Co. (Inc.)*, 49 Treas.Dec. 959, T.D. 41622 (Cust.Ct.1926).

In the instant proceeding, it appears that the bills of lading covering the shipment

from Japan to Belgium were prepared in accordance with the information given by Heine Bros. to Koyo Boeki, the Japanese steel trading company, which company, in turn, transmitted such information to the Japanese charter vessel. It is acknowledged that neither Koyo Boeki nor the owners of the charter vessel were aware that the steel was to be transshipped to the United States from Antwerp. However, it, again, appears that the evidence serves to satisfactorily explain the reason for the absence of the designation of the ultimate destination of the merchandise in question on the Japanese bills of lading. The initial purchase agreement between the plaintiff and La Metallurgie Liegeoise called for neutral markings on each steel coil. Neither the name of La Metallurgie nor the plaintiff was to be on the steel itself. It was explained in the deposition of Camille Brasseur, president of La Metallurgie Liegeoise, that such a provision was a matter of "commercial discretion" and that the procedure of not disclosing the identity of its purchasers to its suppliers or others was in the interest of the Belgian firm. It, accordingly, would have been impossible for the Japanese trading company or the shipper to have included the place of ultimate destination in view of their lack of knowledge of the identity of the parties who successively had purchased the merchandise in question from Heine Bros. of London, England.

The manner of the shipment of the steel from Japan to Antwerp lends a further explanation to the absence of a specific transshipment destination on the bills of lading. The Japanese steel trader, Koyo Boeki, initially offered the steel to Heine Bros. on the basis of its shipment to Antwerp by a charter vessel. It appears that such a mode of shipment was designated for the reason that any cargo in excess of 2,000 metric tons (m/t) could be shipped in this manner at a lower freight charge than by ordinary ocean freighter (*see* Defendant's Exhibit F). Accordingly, the vessel was chartered by the Japanese seller solely for the voyage from Japan to Antwerp. Heine Bros. transmitted the foregoing terms relating to shipment to La Metallurgie Liegeoise, which company, in turn, transmitted the same terms to the plaintiff. In view of the fact that the shipment of the steel in question from Japan to Antwerp was governed by a charter contract, which extended no farther than the Belgian city, it would have been anomalous to have required or expected the ultimate transshipment destination to have been included on the bills of lading.

■ While the absence of a specific intention on the part of the Japanese trading company, Koyo Boeki, to transship the steel to the United States might have been significant in other contexts, *see United States v. Hospitaline, Inc.,* 50 Cust.Ct. 556, 563–64, A.R.D. 156 (1963), (Donlon, J. concurring), in the present proceeding, it is the intention of the plaintiff alone which is controlling. The exemption from the supplemental duty provided for by Additional Duty Order No. 3 addresses itself solely to the American importer (plaintiff) by relieving the importer from the payment of the duty with respect to merchandise "exported to the United States before 12:01 a.m., August 16, 1971." As previously referred to herein, the evidence appears abundant to the court that the plaintiff intended the merchandise in question to be transshipped from Antwerp to the United States at the time it was exported from Japan. The Japanese bills of lading and the absence of the designation of the ultimate destination of merchandise in question thereon, when viewed in the light of all of the evidence adduced in this proceeding, cannot be said to indicate such a contingency of diversion as to negate the intention of the plaintiff to transship the steel coils from Antwerp to the United States.

The defendant submits that a second contingency of diversion existed by virtue of the inspection of the steel by the plaintiff and its representatives while it remained on the pier in Antwerp after its arrival from Japan. More precisely, the Government argues that the mere right of the plaintiff to inspect the steel in Antwerp amounted to a substantial possibility that it would be di-

verted from its intended destination to the United States. The evidence, however, would indicate this contention likewise to be without merit.

The plaintiff inspected the steel in Antwerp for two distinct purposes. The first purpose was to ascertain that the merchandise which arrived in Antwerp was that which it had contracted to purchase from La Metallurgie Liegeoise, and that the steel was marked and identified in accordance with the contract specifications. No evidence appears in this case that the steel failed to conform to the agreed specifications or that the required designated markings had been omitted. It, indeed, would be unusual and contrary to commercial practice to construe the right of inspection in order to insure contract conformity to constitute such a contingency of diversion as would negate the plaintiff's intention to transship the same to the United States. Where, as indicated by the record, the specifications and the markings thereon conformed to its agreement with La Metallurgie, the plaintiff had no legal right to refuse the acceptance of the merchandise.

The second purpose for the inspection of the merchandise was to determine whether any damage had resulted thereto. The defendant in referring to the evidence indicating that certain minor damage had occurred to some of the merchandise in question has stated that the plaintiff, being dissatisfied, contemplated a rejection of the steel for this reason. A review of the record does not disclose evidence of this character and does not confirm such a conjectural and inaccurate conclusion. Although it is undisputed that the steel coils sustained some damage when they arrived in Antwerp, the plaintiff had no legal right to reject them for this reason. Plaintiff and La Metallurgie in their purchase and sale agreement had embodied the provisions therein of a CIF contract, under which the purchaser (plaintiff) bore the risk of loss or damage from the time of the lading on board the charter vessel at the port of shipment in Japan. *Cerro de Pasco Copper Corp. v. Knut Knutsen O.A.S.,* 94 F.Supp. 60 (S.D.N. Y.1950), *aff'd* 187 F.2d 990 (2d Cir. 1951);

*see generally Williston on Sales* § 280(c) (rev.ed.1948); T. Bugan, *When Does Title Pass,* ch. XXI (2d ed. 1951); Llewellyn, *CIF Contracts in American Law,* I, 32 Yale L.J. 711 (1923). The reason for the risk of loss or damage falling upon the purchaser (plaintiff) is predicated upon the fact that an essential element of a CIF contract is the requirement that the seller provide a policy of insurance to the point of destination *for the benefit* of the purchaser. Thus, the plaintiff was protected not by a right of rescission or rejection in case the merchandise was damaged in whole or in part upon its arrival in Antwerp, but by the right of recovery upon the policy of insurance thereon.

Accordingly, when the plaintiff inspected the merchandise on the pier in Antwerp, a claim was made upon the negotiable policy of insurance which had protected the plaintiff's interest in the steel on the voyage from Japan to Belgium. The evidence indicates a settlement was negotiated which covered the damage and the cost of repacking a small number of the steel coils. Had the plaintiff not inspected the steel in Antwerp, it would have forfeited any opportunity for a recovery based upon the policy insuring the shipment from Japan to Antwerp. *See* Plaintiff's Exhibit 11. The court, accordingly, finds nothing in the inspection of the steel and the resulting insurance settlement which in any way negates plaintiff's intention to transship the merchandise to the United States.

The third contingency of diversion submitted by the defendant is contained in defendant's assertion that the plaintiff paid for the steel after its arrival and inspection on the pier in Antwerp. Again, an examination of the record and a consideration of the manner and form of the payment fail to support such an assertion.

The plaintiff pursuant to the terms of its agreement with La Metallurgie Liegeoise paid for the steel by procuring an irrevocable and transferable letter of credit by the Bank of America for the benefit of La Metallurgie. This letter of credit was is-

sued on June 10, 1971, and amended with the consent of all parties concerned on June 18, 1971. The tenor thereof provided for payment of time drafts 60 days after the date of the Japanese bills of lading, although presentation, acceptance and discounting of the drafts could be made at any time upon the presentation of the required documents. The Bank of America expressly agreed to honor all drafts drawn thereon and negotiated on or before October 15, 1971. It appears that the defendant in its contention concerning payment fails to recognize the import of a letter of credit and its legal effect in connection with the law of Sales. Article 3 of the Uniform Customs and Practice for Documentary Credits (1962 revision), International Chamber of Commerce Brochure No. 222, expressly made applicable herein by the terms of the letter of credit, defines the concept of irrevocability as follows:

> An irrevocable credit is a definite undertaking *on the part of an issuing bank* and constitutes the engagement of that bank *to the beneficiary* or, as the case may be, to the beneficiary and bona fide holders of drafts drawn and/or documents presented thereunder, that the provisions for payment, acceptance or negotiation contained in the credit will be duly fulfilled, provided that all the terms and conditions of the credit are complied with.
>
> \* \* \* \* \* \*
>
> Such undertakings can neither be modified nor cancelled without the agreement of all concerned. [Emphasis added.]

■ Thus, the letter of credit procured by the plaintiff formed a contractual relationship between the Bank of America and the beneficiary, La Metallurgie. When the beneficiary presented the required documents to the issuing or confirming bank, a fact which appears undisputed in this proceeding, it became entitled to the payment of its drafts drawn in accordance with the terms of the letter of credit.[6] *See, e. g.,* L. Honnold, *Law of Sales and Sales Financing,* ch. 5, § 5 (1976); Mead, *Documentary Letters of Credit,* 22 Colum.L.Rev. 297, 302–03 (1922). Once the irrevocable letter of credit had been procured from the Bank of America, the plaintiff was impotent to unilaterally modify or cancel it. The mere fact that the credit's tenor—"60 days after date of bill of lading on Banque de Bruxelles, Liege, Belgium"—called for time rather than sight drafts by La Metallurgie Liegeoise does not alter the essential fact that upon presentation of the required documents, the Belgian firm had an absolute legal entitlement to the acceptance of its drafts. Accordingly, by customary commercial practice the plaintiff, contrary to the contention of the defendant, paid for the steel involved in these proceedings at the time the letter of credit was established in June of 1971. *See generally,* Harfield, *Bank Credits and Acceptances* (5th ed. 1974) It is worthy of note that payment by an irrevocable letter of credit was expressly contemplated by the Department of the Treasury in promulgating the exemption from the supplemental duty here in issue. *See* Defendant's Exhibit H.

Admittedly, intent is subjective in character and difficult to ascertain. Accordingly, in the determination thereof, the court must rely on the surrounding facts and circumstances, which, when viewed in their entirety, may reflect the state of mind and conscious intention. In so doing, a review of the record in this proceeding does not lend itself to a construction other than to substantiate the contention of the plaintiff.

■ The evidence appears to clearly establish that at the time the steel was exported from Japan on July 17, 1971, the

---

6. The confirming bank is located in the home country of the seller, and will both notify the seller of the opening of the letter of credit for the seller's benefit, and will confirm payment of the credit's amount to the seller. Thus, the seller may present the required documents and drafts to the confirming bank in its own country instead of being required to forward them to the issuing bank in a foreign land. *See* L. Honnold, *Law of Sales and Sales Financing,* ch. 5, § 5 at 291–95 (1976). In the instant case, the Banque de Bruxelles in Liege, Belgium served as the confirming bank.

plaintiff not only had the intention to transship the same to the United States, but had completed *bona fide* contractual arrangements for the handling and care of the merchandise at Antwerp, Belgium while awaiting transshipment as well as for the actual sale and disposition of the steel to the ultimate purchaser, Barsteel, at Toledo, Ohio. No credible evidence with respect to the possibility of the diversion of the merchandise in question to a destination other than the United States is contained in the record. Every contractual agreement carries with it the inherent possibility of change, substitution, modification or non-performance. However, in order to constitute a contingency of diversion sufficient to bear on plaintiff's intent, the possibility of such diversion must have a realistic basis in fact and not mere conjecture.

 It is the opinion of the court, therefore, that the plaintiff has sustained its burden of proof and has established by substantial evidence that the merchandise in question herein was "exported to the United States before 12:01 a. m., August 16, 1971" and that, accordingly, said merchandise is exempt from the 10% supplemental duty provided by Presidential Proclamation 4074 within the intendment of Additional Duty Order No. 3.

Plaintiff's motion for summary judgment is, accordingly, granted and the cross-motion of the defendant for summary judgment is denied.

Let judgment be entered accordingly.