The UNITED STATES, Appellant,

v.

HUGO STINNES STEEL & METALS CO., Appellee.

Appeal No. 78–16.

United States Court of Customs and Patent Appeals.

June 7, 1979.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Acting Director, Joseph I. Liebman, Saul Davis, New York City, for the United States.

Patrick D. Gill, Rode & Qualey, New York City, attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE * and MILLER, Judges.

RICH, Judge.

This appeal is from a judgment of the Customs Court, 80 Cust.Ct. 175, C.D. 4753, 453 F.Supp. 94 (1978), granting appellee's motion for summary judgment and denying appellant's cross-motion, holding that the merchandise in question, 415 coils of cold-rolled steel sheets, was "exported to the United States before 12:01 a. m., August 16, 1971," and is accordingly exempt from the 10% supplemental duty provided by Presidential Proclamation 4074 within the intent of Additional Duty Order No. 3. We affirm.

* Judge Lane took no part in the decision in this case.

*Presidential Action*

The economic crisis of 1971 that spawned the modification of duties by President Nixon is presented in this court's opinion in *United States v. Yoshida International, Inc.*, 526 F.2d 560, 63 CCPA 15, C.A.D. 1160 (1975), which considered the validity of Proclamation 4074,[1] the *application* of which is here in question. Basically, the proclamation imposed a supplemental duty to help quell an increasingly unfavorable balance of payments. In pertinent part, it provided:

> B. (2) * * * Such supplemental duty [amounting to 10% ad valorem] shall be imposed on all dutiable articles imported into the customs territory of the United States from outside thereof, which are entered, or withdrawn from warehouse, for consumption after 12:01 a. m., August 16, 1971 * * *.

The President then specifically provided that the supplemental duty would be effected by inclusion of section B, supra, in the Tariff Schedules of the United States (TSUS) (19 U.S.C. § 1202):

> C. To implement section B of this Proclamation, the following new subpart shall be inserted after subpart B of part 2 of the Appendix to the Tariff Schedules of the United States:
>
> SUBPART C—Temporary Modifications for Balance of Payments Purposes
>
> * * * * * *

| Item | Article | Rates of Duty | |
| --- | --- | --- | --- |
| | | 1 | 2 |
| 948.00 | Articles, except as exempted under headnote 5 of this subpart, which are not free of duty under these schedules and which are the subject of tariff concessions granted by the United States in trade agreements . . . . . . . . . . | 10% ad val. (See headnote 3 of this subpart.) | No change |

Included in the proclamation were headnotes to subpart C explaining that the duty rate under column 1 of item 948.00 would be added to that imposed on the imported article under the appropriate item in schedules 1 through 7 to determine an *aggregate* rate:

> Subpart C headnotes:
>
> 1. This subpart contains modifications of the provisions of the tariff schedules proclaimed by the President in Proclamation 4074.
>
> 2. *Additional duties imposed*—The duties provided for in this subpart are *cumulative* duties which apply in addition to the duties otherwise imposed on the articles involved. The provisions for these duties are effective with respect to articles entered on and after 12:01 a. m., August 16, 1971, and shall continue in effect until modified or terminated by the President or by the Secretary of the Treasury (hereinafter referred to as the Secretary) in accordance with headnote 4 of this subpart.
>
> 3. *Limitation on additional duties* —The additional 10 percent rate of duty specified in rate of duty column numbered 1 of item 948.00 shall in no event exceed that rate which, when added to the column numbered 1 rate imposed on the imported article under the appropriate item in schedules 1 through 7 of these schedules, would result in an *aggregated* rate in excess of the rate provided for such article in rate of duty column numbered 2. [Emphasis ours.]

Continuing, the President authorized the Secretary of the Treasury—"*For the purposes of this subpart* "—to establish *exemptions* from the rate of additional duty, consistent with the purpose of the proclamation:

> 4. For the purposes of this subpart—
>
> (a) *Delegation of authority to Secretary* —The Secretary may from time to time take action to reduce, eliminate or reimpose the rate of additional duty here-

---

1. 36 Fed.Reg. 15724, 85 Stat. 926 (1971), terminated less than five months later by Proclamation 4098, 36 Fed.Reg. 24201 (1971).

in or to establish exemption therefrom, either generally or with respect to an article which he may specify either generally or as the product of a particular country, if he determines that such action is consistent with safeguarding the balance of payments position of the United States.

Pursuant to this delegation of authority, the Secretary of the Treasury exempted certain articles from the supplemental duty in "Additional Duty Order No. 3,"[2] which became Headnote 5(h) of subpart C:

> Pursuant to the authority vested in the Secretary of the Treasury by Headnote 4(a) subpart C of part 2 of the Appendix to the Tariff Schedules of the United States, I hereby determine that it is consistent with safeguarding the balance of payments position of the United States to *establish exemptions* from the additional duty provided for in subpart C as set forth in Headnote 5 thereof which I hereby amend to add the following:
>
> (h) Articles *exported to the United States before 12:01 a. m., August 16, 1971,* provided that any such articles entered for warehouse or placed in foreign trade zone shall be exempt only if withdrawn from warehouse for consumption or entered or withdrawn for consumption from a foreign trade zone under a request properly filed on or before October 1, 1971.
>
> By virtue of the authority vested in the Secretary of the Treasury, including the authority in Reorganization Plan No. 26 of 1950 (3 CFR Ch. III), the Commissioner of Customs, with the approval of the Assistant Secretary of the Treasury (Enforcement and Operations) is authorized to prescribe such regulations and issue such instructions as may be necessary to carry out the purposes of this order. [Emphasis ours.]

This suit is concerned with whether the merchandise was "exported to the United States before 12:01 a. m., August 16, 1971," and whether judicial review of the decision of the Commissioner of Customs on that question should be restricted to the reasonableness of that decision, as determined from the administrative record, or considered under the review procedures of 28 U.S.C. § 2637(a)[3] permitting additional evidence.

*Facts*

The United States Customs Service determined that the 10% surcharge was applicable on the basis of the following evidence. Information supplied to the Government by appellee indicated that (a) La Métallurgie Liégeoise S.A., a Belgian steel trader, purchased the imported merchandise from Koyo Boeki Co., Ltd., of Japan on a C.I.F. Antwerp basis; (b) appellee Hugo Stinnes Steel & Metals Co. (Hugo Stinnes) purchased the steel coils from La Métallurgie on a C.I.F., Free Out Antwerp basis; (c) the merchandise was shipped from Japan to Belgium on July 17, 1971, unladen in Antwerp on September 3, 1971, stored in a warehouse, shipped from Belgium to the United States on September 25, 1971, and entered at the port of Toledo, Ohio, on November 4, 1971.

In support of its motion for summary judgment, appellee *offered additional evidence* under 28 U.S.C. § 2637(a) consisting of various exhibits and depositions of four witnesses, which was considered by the Customs Court to establish the following facts. In February 1971, Heine Brothers Ltd., an English steel trader, offered La Métallurgie an option to purchase coiled cold-rolled steel sheets to be manufactured in Japan by Nippon Steel Corporation. Heine Brothers in turn had been offered the steel from Koyo Boeki. In its attempt to secure buyers for the steel, La Métallurgie contacted appellee

---

**2.** 36 Fed.Reg. 17667 (1971).

**3.** 28 U.S.C. § 2637(a) (1977) (originally enacted as The Customs Courts Act of 1970, Pub.L.No. 91–271, 84 Stat. 274) reads:

> In any proceeding in the Customs Court, under rules prescribed by the court, the parties and their attorneys shall have an opportunity to introduce evidence, to hear and cross-examine the witnesses of the other party, and to inspect all samples and all papers admitted or offered as evidence, except as provided in subsection (b) of this section.

Hugo Stinnes within a few days of the Heine Brothers' offer, and made its first offer to sell to Stinnes on February 24, 1971.

After negotiations, on May 5, 1971, appellee placed with La Métallurgie a consolidated order, consisting of six separately numbered orders, for 11,000 metric tons of coiled steel, specifying its origin to be "Nippon Steel Corp., Japan" and its shipment to be from Japan by July 31, 1971, via Antwerp to designated ports in the United States. The six separate orders were numbered 10555, 10556, 10557, 10558, 10559, and 10562, and were to be further distinguished, according to the consolidated order, by color markings and Greek letters to correspond to particular sales to U. S. purchasers. For example, the steel coils in question covered by order number 10555 were to be marked with two red strokes and "Antwerp/Alpha" (Alpha indicating Toledo), while those covered by order 10556 were to be marked with two yellow strokes and "Antwerp/Alpha." Payment was arranged via an irrevocable and transferable letter of credit drawn on appellee's account at the Bank of America in New York on June 10, 1971, for the benefit of La Métallurgie.

Almost simultaneously with the inception of negotiations with La Métallurgie (March-April 1971), Hugo Stinnes contacted certain U. S. customers, including Barsteel, Detroit, a division of U. S. Industries, which was aware that the merchandise was to come from Japan. On May 13, 1971, appellee confirmed Barsteel's order for 4,750 metric tons of the steel coils, with both the description and amount similar to that indicated in order numbers 10555 and 10556. However, the written agreement with Barsteel did not specify Japan as the country of origin.

Shipping arrangements from Japan to Antwerp were made by Koyo Boeki, the Japanese steel trader. Apparently because Koyo Boeki used a charter carrier from Nagoya, Japan, to Antwerp, the bill of lading reflected that contract and failed to show the ultimate destination to the U. S. By early July 1971, before the steel coils had been shipped from Japan, appellee arranged for Neptune, Belgian Transport & Shipping Co., Ltd., to handle the steel while in Antwerp and for Cast Lines to ship the merchandise to Toledo.

The steel coils in question were *shipped from Japan on July 17, 1971*, and arrived in Antwerp on or about September 4, 1971, where they were unladen and maintained in an "in-transit" status. Upon arrival, the merchandise bore the designation "Antwerp/Alpha" and the respective red and yellow markings indicating order numbers 10555 and 10556. No Belgian customs duties were paid on the merchandise, nor did it leave the pier at any time until laden for transshipment to Toledo. On or about September 25, 1971, the steel coils were laden aboard Cast Lines' vessel, arriving at Toledo on or about October 10, 1971, and entered there on November 4, 1971.

## CUSTOMS COURT

Subsequent to the denial by the Customs Service of appellee's protest to imposition of the 10% supplemental duty pursuant to Presidential Proclamation 4074, Hugo Stinnes filed its complaint contending that the Commissioner of Customs had improperly determined that the steel coils had been exported to the United States as of September 25, 1971, the date the merchandise was shipped from Antwerp, *after* the August 16, 1971, exemption date of the Treasury Secretary's Additional Duty Order No. 3. In its opinion on appellee's motion for summary judgment, the Customs Court noted that "the government has been urging with increased frequency that decisions made by the Secretary of the Treasury and the Commissioner of Customs of the character presently under consideration may be reviewed only with respect to the reasonableness thereof." The court disagreed with the Government, emphasizing that the language of 28 U.S.C. § 2637(a) indicates Congress's clear intent to provide extensive judicial review in *any* proceeding before the Customs Court. Moreover, the court rejected the contention that the instant action should be considered outside the usual framework of cases presented before the court, and characterized the Presidential proclamation and Additional Duty Order No. 3 as *a part of the Tariff Schedules of the United States, the legal equivalent of a*

*Congressional enactment.* Consequently, the court declared appellee to be in the same position as any importer seeking adjudication upon denial of its protest to the imposition of a statutory rate of duty by the Customs Service.

Recognizing the strong presumption of correctness that is attributed to the Commissioner's determination and the burden on appellee to rebut it (28 U.S.C. § 2635(a)), the Customs Court examined the basis of the determination. The court concluded that the proof required to show that the steel coils, by reason of their date of exportation from Japan, were within the duty exemption of Additional Duty Order No. 3 is determined by this court's statement in *United States v. National Sugar Refining Co.*, 39 CCPA 96, 101, C.A.D. 470 (1951) that:

An exportation is [1] a severance of goods from the mass of things belonging to [the country of origin] with [2] the intention of uniting them to the mass of things belonging to some foreign country.

Applying this definition, the Customs Court found that the evidence adduced on the cross-motions overwhelmingly indicated that at the time the steel coils were shipped from Japan on July 17, 1971, appellee intended that they be joined to the mass of goods of the United States and to that of no other country.

To the Government's argument that there existed a significant contingency of diversion of the goods to a port other than Toledo, the court stated that the weight and sufficiency of all of the evidence demonstrated appellee's continuing intention to transship the merchandise. Specifically, the court concluded that the absence of the ultimate destination on the bills of lading covering shipment from Japan to Antwerp was satisfactorily explained because neither Koyo Boeki nor the chartering shippers knew of the transshipment to the U. S. It was the intention of appellee to transship

rather than the absence of that intent by Koyo Boeki that was controlling, according to the Customs Court.

Similarly, the court disagreed that appellee's right to inspect the steel in Antwerp was persuasive of a substantial possibility of diversion, noting that appellee was merely asserting its rights to assure contract conformity and to determine damage and had no legal right to refuse acceptance or reject the goods. Finally, the court concluded that, contrary to the Government's contention that Hugo Stinnes had not paid for the steel until after its arrival and inspection at Antwerp, appellee paid La Métallurgie as of the June 1971 date that the irrevocable and transferable letter of credit was established for the benefit of La Métallurgie. Appellee had established, said the court, that no credible evidence existed to support a realistic basis for a contingency of diversion sufficient to disturb appellee's intent to transship.

## OPINION

The Government argues with great fervor that this case is, contrary to the Customs Court holding, outside the usual framework of a classification or valuation case. Here, so the Government alleges, the Additional Duty Order No. 3 issued by the Secretary of the Treasury "must be viewed as possessing the status of a valid statute." Pursuant to the supposed "statute," i. e., the order, the determination by the Customs Service (and the denial by the Acting Commissioner of Customs of the appellee's request for reconsideration) that the steel coils were properly classified under item 948.00, TSUS, constituted an *interpretation of a statute*, such "interpretation" being within the delegation of authority expressed in the Secretary's order "to prescribe such *regulations* and issue such *instructions* as may be necessary to carry out the purposes of this order [emphasis ours]."[4]

4. In its statement of material facts before the Customs Court, the Government indicated the basis for the determination by the Customs Service applying the 10% surcharge of item 948.00 as follows:

While we have taken note of the Antwerp bills of lading by which the merchandise in question was transshipped to various United States ports, the documents considered in their entirety do not conclusively establish

This case, says the Government, is strictly one of valid exercise of *discretionary* authority by an administrative agency and its official, and involves only the question of whether the action was contrary to law, arbitrary or capricious, or an abuse of discretion. We are told that the ruling by the Customs Court applying *de novo* review operates as "a trespass upon the constitutional sphere of influence uniquely within the domain of the Executive Branch of the Government."

■ We do not agree with the Government's contention that the Secretary's order must be considered a statute separate and distinct from the TSUS. Indeed, the proclamation itself expressly provides that it be implemented by means of a new subpart that *shall be inserted in the TSUS.* Only "For the purposes of this subpart" was authority delegated to the Secretary of the Treasury, pursuant to which he issued the order that the Government would have us raise to the status of a unique statute. We decline to do so.

■ When the President implemented the proclamation by means of the Appendix to the Tariff Schedules, he necessarily submitted application of the surcharge to the same review procedures as a determination based solely on a provision in schedules 1–8. To conclude otherwise would present the

anomaly that an importer contesting *both* classification under one part of the TSUS *and* assessment under another part of the TSUS would be subject to differing review procedures for each of the issues. We hold that there is no logical basis for distinguishing between a statutory rate of duty and the present proclaimed rate of duty, and that the Customs Court was correct in concluding that Presidential Proclamation 4074 and Additional Duty Order No. 3 became part of the TSUS.

■ Our position is supported by the *Tariff Classification Study, Submitting Report,* United States Tariff Commission (1960), stating in pertinent part, at 12:

* * * the appendix to the proposed revised tariff schedules is designed for the incorporation of all legislation, proclamations, and administrative actions which, *because of their temporary and collateral nature,* are not assimilable into the main body of the tariff schedules. [Emphasis ours.]

Thus, only because material in the appendix is "temporary and collateral"—and not because it is substantively unique—is such material not incorporated directly into schedules 1–8 of the TSUS. We consider item 948.00 "a proviso, albeit a temporary one, of the original classification" to which the steel coils in question were subject.

that the merchandise was *destined for the United States at the time of exportation from Japan,* or that the merchandise could not have entered into the commerce of Belgium. For example, the bills of lading from Japan to Antwerp make no mention of transshipment, and the sales in question were not direct sales from the Japanese manufacturer to the United States importers. [Emphasis ours.] Upon appellee's request for reconsideration, Acting Commissioner of Customs Rains stated: Your letter cites various cases in which the courts have held that merchandise produced in Country A but shipped to the United States, by way of Country B was, for valuation purposes, the product of Country A. However, in this case the country of exportation for valuation purposes is not in issue but, rather, the question is one of establishing the fact of a legal obligation to transship

the merchandise in question to the United States at the time it left Japan for purposes of applying the surcharge. While the Belgium bill of lading may be some indication of an intention as of August 9, 1971, to transship the merchandise to the United States, such bill of lading does not constitute a legal obligation to do so. In the absence of proof that the merchandise was under an absolute legal obligation to be transshipped to the United States, and could not, under any circumstances, have entered the stream of commerce in Belgium or have been transshipped to a country other than the United States, we must affirm our prior conclusion that, for purposes of the surcharge, *the date of exportation to the United States was the date on which the goods were shipped from Belgium.* [Emphasis ours.]

*Czarnikow-Rionda Co. v. United States*, 60 CCPA 6, 8, C.A.D. 1071, 468 F.2d 211, 214 (1972). As such, the review procedures under 28 U.S.C. § 2637(a) are as applicable to a civil action contesting imposition of the 10% surcharge of Presidential Proclamation 4074 as they would be to an action challenging imposition of the duty rate under the original classification.[5] Therefore, we conclude that the Customs Court properly considered the depositions and exhibits offered by appellee in support of its motion for summary judgment.

We turn now to the history and purpose of Additional Duty Order No. 3. On August 31, 1971, two weeks after the effective date of the President's proclamation, Assistant Secretary of the Treasury Rossides issued a memorandum to Secretary of the Treasury Connally describing requests for exemptions based on equity and absence of impact on this country's balance of payments. Assistant Secretary Rossides indicated four areas of significant requests, two being:

2. Previously shipped—goods that had been exported from a foreign port before 12:01 a. m., August 16.

4. Contracted for—goods that were ordered under contract prior to 12:01 a. m., August 16, but not shipped (exported) prior to that date.

He recommended that, based on equitable considerations, goods previously shipped be exempted while goods ordered under contract but not shipped not be exempted. Subsequently, Secretary Connally approved the recommendation and issued the order that became part of the TSUS.

Counsel for the Government argued before the Customs Court that the applicable standard to qualify for an exemption under the order incorporated into the TSUS was the absence of a contingency of diversion existing at the time the goods left Japan. The Government maintains that appellee must have relinquished sufficient control over disposition of the steel coils to establish a legal obligation to transship the merchandise to the United States at the time it left Japan, i. e., to negate a possibility of diversion from shipment to the United States.

■ We are not persuaded that the Customs Court erred either by considering that "the proof of intent of the plaintiff [Hugo Stinnes] as an importer and the contingency of a diversion of the merchandise in question are closely related but not separate and individual elements of proof" or by employing this court's definition of "exportation" in *United States v. National Sugar Refining Co.*, 39 CCPA 96, C.A.D. 470 (1951).[6] Cer-

5. We recognize that the Customs Court expressed its belief that the broad language of 28 U.S.C. § 2637(a), supra note 3, contradicts the Government's position that limited scope of review is warranted, and that its opinion has been cited for this proposition in *Michelin Tire Corp. v. United States*, 82 Cust.Ct. ——, C.D. 79–6, 469 F.Supp. 270, *petition for writs of prohibition and mandamus pending sub nom. United States v. Watson*, No. 79–17 (CCPA 1979). We do not rest our decision today on this basis, concluding, as we do, that this case falls within the same procedural framework as classification and appraisement cases. Whether the Customs Court was correct in deciding that review under the procedures of § 2637(a) applies in *any* proceeding before the Customs Court—including countervailing duty and antidumping cases—is an issue not before us. The question before the Customs Court was simply one of *fact* under Additional Duty Order No. 3, a part of the TSUS, i. e., whether the steel coils were "exported to the United States before 12:01 a. m., August 16, 1971." There being no

action in this case committed to agency discretion, we do not address a situation in which an action is so committed.

6. In denying appellee's request for reconsideration, the Acting Commissioner himself considered intent to transship relevant to (but not persuasive of) a legal obligation to transship. We agree with the Customs Court that intent and contingency of diversion are matters governed by the weight and sufficiency of all the evidence.

Further, we find no basis for the Government's contention that, in this case, the intent of the exporter (Koyo Boeki) and the immediate purchaser (Heine Brothers) are controlling. As the Customs Court concluded, the memorandum supporting the Secretary's order was addressed to the *importer's* intent and shipment from a foreign port before August 16, 1971. As did the lower court, we consider the intent of appellee, the dominant party in these transactions, to be controlling.

tainly, it cannot be said that the Customs Court ignored the policy and purpose of the proclamation and order. Concerning appellee's intent to transship, we think that the Customs Court's use of this criterion was consistent with the "equitable considerations" that were the basis for the Secretary's exemption. We cannot agree with the Government that the instant goods, which were shipped from Japan to the United States via Belgium under back-to-back binding contracts (as conceded by the Government in oral argument before this court), are outside the confines of goods "previously shipped * * * from a foreign port * * * but which had not yet arrived in the U. S." before 12:01 a. m., August 16, 1971, as indicated in the recommendation and discussion of Assistant Secretary Rossides that was approved by Secretary Connally. In fact, we find the Government's rigid definition of "exported" to be at odds with the intent of the Secretary's order as construed in the light of Assistant Secretary Rossides' memorandum. For the same reasons, we do not find error in the lower court's citation to the *National Sugar* case.[7]

■ Lastly, we find no error in the holding of the Customs Court, based on the evidence adduced on motion for summary judgment, that there existed no contingency of diversion sufficient to overcome the evidence of appellee's intent and contractual arrangements to transship the steel coils to Toledo. As the lower court said:

The evidence appears to clearly establish that at the time the steel was exported from Japan on July 17, 1971, the plaintiff not only had the intention to transship the same to the United States, but had completed *bona fide* contractual arrangements for the handling and care of the merchandise at Antwerp, Belgium while awaiting transshipment as well as for the actual sale and disposition of the steel to the ultimate purchaser, Barsteel, at Toledo, Ohio. No credible evidence with respect to the possibility of the diversion of the merchandise in question to a destination other than the United States is contained in the record. Every contractual agreement carries with it the inherent possibility of change, substitution, modification or non-performance. However, in order to constitute a contingency of diversion sufficient to bear on plaintiff's intent, the possibility of such diversion must have a realistic basis in fact and not mere conjecture.

The Customs Court clearly considered carefully each of the Government's arguments regarding contingency of diversion and found them wanting. We agree fully with the court's analysis and conclusions, and find no persuasive evidence that it erred in determining that appellee's right to inspect to assure contract compliance and ascertain damage and its method of paying La Métallurgie did not constitute an appreciable contingency of diversion.

The judgment of the Customs Court is *affirmed.*

**7.** The Government's rigidity possibly emanates from its apparent misreading of the intent of Rossides' memorandum. He stated that fairness dictated that the Secretary exempt goods that, although they had not *arrived* in the United States by the cut-off date, were indeed already *destined* for a U. S. port under contract. On the other hand, goods *not yet shipped* from a foreign port were distinguishable. We construe the resulting order to reasonably encompass appellee's goods, which were "previously shipped— * * * exported from a foreign port," Japan, on July 17, 1971, fully a month before the cut-off date of the order. The Government's contention that the surcharge be "difficult to escape" fails to address the considerations of equity that were the raison d'être of the Secretary's order.